COMMONWEALTH *vs*. JAMES DISTEFANO
(and fourteen companion cases[1]).

Middlesex.   April 17, 1986. — July 22, 1986.

Present: KASS, KAPLAN, & WARNER, JJ.

*Search and Seizure*, Probable cause, Affidavit, Warrant, Forcible entry by
police, Nighttime search. *Probable Cause. Controlled Substances*.

Probable cause for the issuance of a search warrant for narcotic drugs in
the defendants' house was established by an affidavit based on statements
by an unidentified informant, where the informant's statement that he
had purchased heroin from the defendants and the detail in the information
revealed the basis of his knowledge, where independent observations
made by experienced police officers suggested that drugs were being
moved in and out of the premises in question, and where neither the
two-day period between the last information received by police and the
application for the warrant, nor the eight-day period between receipt of
that information and the execution of the warrant was such as to cause
the information to be stale when the warrant was executed. [540-541]
Where a police officer applying for a search warrant for narcotic drugs had
good reason to request dispensation from the requirement that police
officers knock and identify themselves before the search, and where the
premises to be searched belonged to persons suspected of being seasoned
traffickers in narcotics who had been observed to be conducting them-
selves with caution, the fact that the warrant issued authorized a nighttime
search without a particular request therefor did not invalidate the warrant.
[541-543]

INDICTMENTS found and returned in the Superior Court De-
partment on January 31, 1985.

Motions to suppress evidence were heard by *Hiller B. Zobel*, J.

[1] Six of the companion cases are against James DiStefano and eight are
against Jean DiStefano, also known as Jean Cataldo, and referred to as
Jeanne J. Cataldo in all the documents connected with the search warrant.

An application for interlocutory appeal filed in the Supreme Judicial Court for the county of Suffolk was granted by *Francis P. O'Connor*, J., and the appeal was transferred by him to the Appeals Court.

*Michael Fabbri*, Assistant District Attorney, for the Commonwealth.

*Ronald Ian Segal* for the defendants.

KASS, J. Upon motions by the defendants, a judge of the Superior Court ordered the suppression of evidence seized during a search of the defendants' home at 25 East Elm Street, Everett. The Commonwealth applied to a single justice of the Supreme Judicial Court for leave to take an interlocutory appeal under Mass.R.Crim.P. 15(b)(2), 378 Mass. 884 (1979). The single justice granted the application and ordered that the case be heard by a panel of this court.

We review the adequacy of the affidavit made by a State police officer in support of the search warrant under which the police acted.

1. *Probable cause*. That affidavit relied heavily on an informant's tip and, in review, we are to analyze the basis of knowledge and the reliability of the information supplied to determine whether probable cause existed to issue a search warrant. *Commonwealth* v. *Upton*, 394 Mass. 363 (1985). *Commonwealth* v. *Borges*, 395 Mass. 788, 794 (1985). Those opinions apply tests originally developed in *Aguilar* v. *Texas*, 378 U.S. 108 (1964), and *Spinelli* v. *United States*, 393 U.S. 410 (1969). See Smith, Criminal Practice and Procedure §§ 208-215 (2d ed. 1983 & Supp. 1986). Appraisal of the affidavit, as the cases tell us, ought to be conducted in a common sense fashion, not hypertechnically. See *Commonwealth* v. *Burt*, 393 Mass. 703, 714 (1985); *Commonwealth* v. *Labelle*, 15 Mass. App. Ct. 175, 179 (1983); Smith, Criminal Practice and Procedure § 178 (2d ed. 1983 & Supp. 1986). Compare *Commonwealth* v. *Sampson*, 20 Mass. App. Ct. 970 (1985). A policeman's affidavit, Justice Fortas remarked in dissent in the *Spinelli* case (at 438), "should not be judged as an entry in an essay contest." See also *United States* v. *Harris*, 403 U.S. 573, 579 (1971).

In the case at bar, the supporting affidavit was made by Thomas J. Quigley, a State trooper assigned at the time to the Middlesex district attorney's narcotics unit. Quigley received information from a drug addict (the affidavit refers to the addict-informant as CIX, and we adopt that mysterious sounding appellation) that CIX had bought pure heroin from persons known to CIX as Jimmy and Jeanne DiStefano, usually at a price of $300 per half gram and $600 per gram. CIX said he had been introduced through a mutual friend; Jimmy DiStefano would not meet with customers unless he had known them for years. The usual procedure for a customer, CIX said, was to call Jeanne at 389— - - - - and she would tell the customer where to meet. Usual meeting places included a Burger King parking lot next to the Chelsea Mall, and the parking lot of the Chelsea Mall itself. Jeanne drove a blue Mercury Cougar automobile.

CIX said he had been present at a "buy" from Jeanne in the Burger King parking lot during the week of September 17, 1984, i.e., reasonably close in time to the date, September 28, 1984, on which Trooper Quigley executed the affidavit. CIX also told Trooper Quigley he had accompanied a friend to the DiStefano home to buy heroin within the week before the date on which the affidavit was sworn to and the search warrant issued. CIX did not know the name of the street on which the DiStefano house was located, but placed the house only a minute away from the Burger King and next to an Everett public works building. From the State Police Criminal Information Bureau, Trooper Quigley learned that 389— - - - - was a nonpublished telephone number listed to Jeanne J. Cataldo, 25 East Elm Street, Everett, information which correlated with CIX's tip. CIX had reported that Jeanne's last name had been Cataldo, but CIX thought she had married Jimmy. The address linked to the telephone number, 25 East Elm Street, was the address of the house next to an Everett public works building.

On September 26, 1984, Trooper Quigley again spoke with CIX. The latter during the preceding three days had spoken with Jeanne, who had said she had brown heroin for sale and expected to have dilaudid and white heroin for sale within the

next few days. CIX also mentioned that he had noticed two Doberman pinschers at the Cataldo/DiStefano house.

Meanwhile Trooper Quigley had mounted a stakeout of the Cataldo/DiStefano house on September 24, 1984. That initial surveillance yielded no observation of consequence, although he was able to verify that Jeanne, indeed, drove a blue Mercury Cougar. Quigley also did some checking with the Federal Drug Enforcement Agency, from which he learned that Jeanne and Jimmy each had considerable histories of unlawful dealing in narcotics.

Surveillance of the Cataldo/DiStefano house resumed on September 26, 1984. Considered in isolation, what the officers observed would hardly have been a basis for action. Taken with what they had already learned, their observations had some value. A car parked at a corner before the Cataldo/Di-Stefano house, its lights went off, but the driver did not get out. Rather DiStefano emerged from his house and entered the parked car. He stayed in the car for about five minutes, during which the car moved past 25 East Elm Street and was parked one block away. There, DiStefano left the car and returned to his house on foot.

At 8:00 P.M. that day, a Gerald Pini, known to the police as a drug dealer,[2] arrived at 25 East Elm Street. He left the house at 8:30 P.M., went to his car, and re-entered carrying a small package.

During their surveillance, the police officers noted a Doberman pinscher in front of the Cataldo/DiStefano house, thus verifying another piece of the picture CIX had described to them.

The stakeout resumed at 5:20 P.M. on September 27th. Pini arrived at 25 East Elm Street at 5:50 P.M. Jeanne left at 5:55 P.M., and Pini left five minutes later. A woman unknown to the police emerged from the house at 6:55 P.M., walked to a

---

[2] We engage in a certain amount of foreshortening and reordering of the sequence of Trooper Quigley's affidavit. At the time he was watching Pini, for example, Quigley did not know who he was. That was a fact he sorted out later by examining photographs from the Massachusetts State police bureau of identification.

white Chevrolet automobile without registration plates, entered the car from the passenger side, and either took something from, or put something in, the glove compartment. She locked the Chevrolet and then drove off in a car registered to Jeanne. At 7:00 P.M. a woman in her twenties arrived in a white Plymouth automobile at 25 East Elm Street and went inside. She left at 7:30 P.M., escorted by Cataldo and DiStefano. Five mintues later, Jeanne left in her blue Cougar in the direction of the Chelsea Mall. That squared with CIX's description of the Cataldo/DiStefano modus operandi.

At 7:45 P.M., a man arrived in a white Buick automobile registered to a Gregory J. Slaney, who the officers found had a record which included possession of controlled substances with intent to distribute them. Jeanne returned at 8:00 P.M., followed by Pini and another man. The driver of the Buick left at 8:20 P.M. Pini and his companion left at 8:22 P.M.

In applying for a search warrant, Trooper Quigley noted that he had confirmed several details of what CIX had told him: the Cataldo/DiStefano house was next to a Department of Public Works garage; it was close to a Burger King; the unlisted telephone number belonged to Jeanne Cataldo; Cataldo operated a blue Mercury Cougar; Cataldo and DiStefano had Dobermen pinschers (at least one had been seen). Quigley might have added that the method and place of delivery described by CIX had been borne out by observation. Concerning his observations, Quigley, who claimed specialized training in the investigation of narcotics violations and participation in over 100 drug cases, said they were consistent with the illegal distribution of narcotics. A judge of the Superior Court signed a "no knock" warrant, as the police had requested, on September 28, 1984. A search in accordance with the warrant was conducted on the night of October 4, 1984. It yielded considerable inculpatory material.

Although CIX's information suffered the weakness of not coming from a tested informant, it was fortified by corroboration of details through police investigation. *Draper* v. *United States*, 358 U.S. 307, 313 (1959). See *Commonwealth* v. *Kaufman*, 381 Mass. 301, 303 (1980). The relative specificity of

much that CIX had supplied about the Cataldo/DiStefano operation tended to buttress its credibility.

As for the basis of CIX's knowledge, his statement that he had purchased drugs from the defendants and the observed detail in the tip were important indicators. *United States* v. *Harris,* 403 U.S. at 583. *Commonwealth* v. *Nowells,* 390 Mass. 621, 626 (1983). *Commonwealth* v. *Atchue,* 393 Mass. 343, 348 (1984). *Commonwealth* v. *Norris,* 6 Mass. App. Ct. 761, 764-765 (1978). Contrast the comparative lack of detail and direct involvement in *Commonwealth* v. *Reddington,* 395 Mass. 315, 324 (1985); and *Commonwealth* v. *Bottari,* 395 Mass. 777, 784 (1985).

Indeed, the motion judge, in a thoughtful memorandum, registered satisfaction with the reliability of the informant's information and CIX's basis for believing that the defendants were involved in the distribution of narcotics. The judge's concern, having in mind *Commonwealth* v. *Reddington,* 395 Mass. at 322-323, was whether "the informant or the police had a basis of knowledge adequate to support an inference that drugs were on hand *in the house* at the time the informant spoke to the police" (emphasis original).

On the basis of the informant's information and the police investigation, we are of opinion that Trooper Quigley's affidavit furnished probable cause to believe that there were drugs in the house when the search warrant was issued and when the search was made. CIX told the police he had been to the Cataldo/DiStefano house as recently as the week of September 17th, and had been given to understand by Jeanne on about September 23rd that fresh inventory of dilaudid and white heroin was expected. The independent observations made by the experienced police during surveillance on September 26th supported an inference that drugs were moving in and out of the premises. See *Commonwealth* v. *Saleh,* 396 Mass. 406, 411-412 (1985). The time gap between late information and the affidavit was two days; between late information and the search, eight days. Neither period was such as to cause the information supporting the search warrant to be stale when the warrant was executed. See *Commonwealth* v. *Vynorius,*

369 Mass. 17, 25 (1975); *Commonwealth* v. *Smith*, 370 Mass. 335, 343 (1976); *Commonwealth* v. *Blye*, 5 Mass. App. Ct. 817 (1977). Moreover, as those cases call to attention, freshness of the information becomes a less weighty factor when the criminal activity is a continuing business. See also *United States* v. *Campbell*, 732 F.2d 1017, 1019 (1st Cir. 1984). The warrant was executed within the requisite seven days of its issuance. G. L. c. 276, § 3A. See *Commonwealth* v. *Cromer*, 365 Mass. 519 (1974).

We think that the application of a common sense, nontechnical reading of the application for a search warrant, *Commonwealth* v. *Saleh*, 396 Mass. at 412, furnished " 'a substantial basis for concluding that any of the articles described in the warrant are probably in the place to be searched.' " *Commonwealth* v. *Truax*, 397 Mass. 174, 178 (1986).

2. *Authorization of nighttime search.* The defendants imaginatively attack the warrant on the additional ground that it authorized a nighttime search without a particular request that the search might be conducted at night. They argue that a nighttime search, unless authorized by a magistrate's finding that the search can only be safely or successfully executed at nighttime, offends the prohibition against unreasonable searches contained in the Fourth Amendment to the United States Constitution and art. 14 of the Declaration of Rights of the Constitution of the Commonwealth.

There is some doubt whether the search in this case took place in the nighttime in the sense that nighttime searches are most often regarded with revulsion — the rousing of residents out of their beds. See, e.g., *Monroe* v. *Pape*, 365 U.S. 167, 210 (1961) (Frankfurter, J., dissenting); *Gooding* v. *United States*, 416 U.S. 430, 463 (1974) (Marshall, J., dissenting). Thus, in the Model Code of Pre-Arraignment Procedure § 220.2(3) (1975), it is provided that, except upon special authorization of nighttime searches, a search warrant shall be executed between 8:00 A.M. and 8:00 P.M. The warrant in the case at bar was executed at 7:30 P.M.

In applying for the search warrant, Trooper Quigley requested dispensation from the common law knock and announce

rule because James DiStefano had previously possessed a fire-arm, had one or more Doberman pinschers on the premises, had been a fugitive, and appeared to be dealing in contrabrand susceptible of disposal down a toilet or drain. The request was justifiably granted under the principles laid down in *Commonwealth* v. *Scalise*, 387 Mass. 413 (1982). The warrant was based on the form which appears in G. L. c. 276, § 2A, inserted by St. 1964, c. 557, § 3. There were struck from the opening line of the second paragraph the words "in the daytime" so that the paragraph began: "We therefore command you at any time of the day or night to make an entry without knocking and announcing followed by an immediate search . . . ."

Under G. L. c. 276, § 2, as appearing in St. 1964, c. 557, § 2, the norm is to command a search in the daytime, and only "if the warrant so directs," in the nighttime. In *Commonwealth* v. *Hinds*, 145 Mass. 182, 184-186 (1887), the idea that the Legislature might authorize the issuance of nighttime search warrants more or less upon the discretion of the officer who signed the warrant was accepted without a second thought. Such also was the view of the majority in *Gooding* v. *United States*, 416 U.S. at 431-458, which considered only the resolution of conflicting District of Columbia statutes. One statute allowed nighttime searches upon direction of the magistrate who issued the warrant; the other required a showing of special need for a nighttime search. The Court concluded that no special showing for a nighttime search was required. That the Fourth Amendment might be implicated was advanced only in the dissents of Justices Douglas and Marshall. *Id.* at 459-469.

The thoughtful view is that nighttime intrusions "are alarming and danger provoking, and should not be authorized without good cause shown." Model Code of Pre-Arraignment Procedure, commentary to § 220.2, at 513. See 2 LaFave, Search and Seizure § 4.7(b) (1978). Unlawful nighttime searches of the home present the unlawful search in its most obnoxious form. See *Monroe* v. *Pape*, 365 U.S. at 210 (Frankfurter, J., dissenting). The Massachusetts statute, i.e., G. L. c. 276, § 2, insofar as it requires the warrant to direct a nighttime search, approaches the position of the Model Code, although it does

not embrace it. One presumes a magistrate would direct a nighttime search only for cause, but the magistrate is not required to state what the cause is. It would be good practice if a nighttime warrant were issued only on a request backed up by reasons.

As here applied, there is no infirmity in the issuance of a day or night warrant under G. L. c. 276, § 2. The object of search was a house said to belong to seasoned traffickers in narcotics. The police had observed that the suspects conducted themselves with alert caution. If it was necessary to dispense with knock and announcement, it might well be desirable to have the cover of darkness and to arrive when the defendants' guard might be down.

The order granting the motion to suppress is reversed, and the cases are remanded to the Superior Court for trial.

*So ordered.*