2006-NMCA-003

126 P.3d 567

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**William C. SCOTT, Defendant–Appellant.**

**No. 24,735.**

Court of Appeals of New Mexico.

Nov. 9, 2005.

Certiorari Granted, No. 29,562, Jan. 5, 2006.

Patricia A. Madrid, Attorney General Arthur W. Pepin, Assistant Attorney General, Santa Fe, NM, for Appellee.

Inocente, P.C., Brian A. Pori, Albuquerque, NM, for Appellant.

## OPINION

KENNEDY, Judge.

{1} In this case we examine when and how police conduct in the investigation of a misdemeanor traffic violation exceeds the bounds of reasonableness to impinge upon constitutional protections against illegal searches and seizures.  We hold the post-midnight visit to

Defendant's home during which police ordered Defendant to be awakened and then demanded that Defendant exit his home constitutes a non-consensual investigative detention. We further hold the seizure amounted to an illegal seizure under the New Mexico and United States Constitutions because it was unsupported by reasonable suspicion. As a result, we reverse the district court. The evidence obtained as a result of the post-midnight visit by the police to the Defendant's home is suppressed as to the identification of Defendant and any admissions Defendant made as a consequence of that police visit.

## PROCEDURAL HISTORY AND FACTS

{2} On the facts set forth below, Defendant filed a motion to suppress with the metropolitan court, claiming an unconstitutional seizure of his person. The metropolitan court granted Defendant's motion, entered an order suppressing the evidence obtained from the police visit, and dismissed the case. The State then appealed de novo to the district court, which denied Defendant's motion to suppress. Pursuant to a conditional plea and disposition agreement in the district court, Defendant was convicted of the petty misdemeanor of careless driving. *See* NMSA 1978, § 66–8–114 (1978). He reserved for appeal issues from his motion to suppress based upon the police conduct that resulted in a citation being issued to him. The issue of whether police conduct was constitutionally permissible was thus adequately preserved for our review. *See State v. Varela*, 1999–NMSC–045, ¶ 25, 128 N.M. 454, 993 P.2d 1280.

{3} On April 20, 2003, Officer Moore of the Albuquerque Police Department was working near Osuna Road and I–25. As Officer Moore left the area and prepared to enter southbound I–25, he observed two motorcycles on the roadway a short distance ahead of him. One of the motorcycles was red. The driver of the red motorcycle was a blond man, 18 to 25 years of age, who was swerving in and out of traffic and "popp[ing]" "wheelies." Officer Moore considered this "shocking" behavior and a "potential accident." Officer Moore initiated pursuit. He activated his overhead lights and later his siren, but the motorcycles did not stop. Both motorcycles then rapidly accelerated. Officer Moore lost sight of the speeding motorcycles when his vehicle developed engine trouble.

{4} Officer Moore recorded the license plate number of the red motorcycle and decided to pursue the matter at a later time. When he looked up the plate number, Officer Moore learned that the number did not correspond to a valid vehicle registration. Other officers suggested that the "9" Officer Moore had recorded as the first digit of the plate number was likely a "P" because motorcycle plate numbers start with a "P." Officer Moore confirmed that motorcycle plate numbers began with a "P" by observing registered motorcycles parked outside a motorcycle shop. When he substituted the "9" with a "P," he found that the plate number corresponded to a motorcycle registered in Defendant's name. The address on the registration was Defendant's home.

{5} Officer Moore was asked on the witness stand about standard procedures for investigating traffic violations. He testified that had he been confident that the registered owner was the driver he had observed, he could have mailed Defendant a summons to appear in court on the charges based on the registration information. However, Officer Moore was uncertain whether the driver he had observed and the motorcycle's registered owner were the same person. Officer Moore did not want to inconvenience Defendant if Defendant was the motorcycle's owner but innocent of the behavior Officer Moore had observed. Officer Moore thus decided to contact Defendant personally.

{6} Officer Moore worked the "graveyard" shift and did not report for duty again until about 10:00 p.m. on Tuesday, April 22. Officer Moore testified that once he returned to duty, he considered it imperative to continue his investigation and to contact anyone who might know something about the motorcycle. It does not appear that he considered pursuing his investigation during daytime hours. Officer Moore testified that "it would be irresponsible for me to make contact with [Defendant] at a time where I was not acting in my duties as a police officer or at least during my duty hours."

{7} Officer Moore went to the address of the motorcycle's registered owner, "in hopes of making contact or at least observing a motorcycle there or making contact with the owner, certainly the driver that day, because I had no idea at that point whether the driver was in fact the owner of the vehicle." He believed someone would likely be at home because of the late hour. He was not particularly concerned about the lateness of the hour because that was when *he* worked, and he took calls throughout his shift. On the whole, Officer Moore believed the danger of the violation he had observed outweighed any inconvenience to the owner of making contact at a late hour. Officer Moore also testified he was certain that if Defendant had not been the driver he had observed, Defendant, as owner of the motorcycle, would "want to know how recklessly his motorcycle was being operated."

{8} Officer Moore arrived at Defendant's home at 12:21 a.m., the morning of Wednesday, April 23, 2003. Officer Moore had neither an arrest warrant nor a search warrant when he went to Defendant's home. He was dressed in full uniform and was driving his police car. Officer Moore noticed a motorcycle parked on the property at Defendant's home, but did not attempt to associate it with the incident. Officer Moore's knock on the front door was answered by a young man who was Defendant's roommate. Officer Moore asked if Defendant was at home. Defendant's roommate replied in the affirmative and asked why Officer Moore was there. Officer Moore told Defendant's roommate that he was conducting an investigation and wanted to speak with Defendant. Defendant's roommate said Defendant was in the back and that he would get him. Officer Moore knew Defendant would need to be awakened to talk with him.

{9} When Defendant got to the door, Officer Moore told him that he was investigating a traffic violation and asked him to step outside the house. When Defendant exited the house, Officer Moore recognized Defendant as the person he had seen on the red motorcycle. At that time, Officer Moore advised Defendant that he was, at that point, conducting a criminal investigation.

{10} Officer Moore read Defendant a *Miranda* advisory, which Defendant indicated he understood. In the course of their conversation, Defendant admitted that he was the motorcycle driver Officer Moore had observed the previous Sunday. Officer Moore informed Defendant he was considering citing Defendant for reckless driving but that he needed to leave.

{11} After leaving Defendant's home, Officer Moore conferred with his supervisor. Officer Moore was told by his supervisor to contact Defendant again at "a more reasonable hour" and to either cite Defendant or issue a summons on the charge. Later that same morning of April 23, at approximately 6:30 a.m., Officer Moore delivered the citation to Defendant at Defendant's home.

{12} In metropolitan court, Defendant's motion to suppress the evidence obtained during Officer Moore's late night visit to Defendant's home was granted and the case was dismissed. The State appealed de novo to the district court. The district court heard and denied Defendant's motion to suppress and issued a written order incorporating its observations from the suppression hearing. Defendant appeals as part of a conditional plea agreement that followed denial of his motion to suppress.

**STANDARD OF REVIEW**

{13} Questions about whether a person has been seized in violation of the Fourth Amendment of the United States Constitution are mixed questions of law and fact. *State v. Walters*, 1997–NMCA–013, ¶ 8, 123 N.M. 88, 934 P.2d 282. Questions surrounding the suppression of evidence are mixed questions of law and fact. *State v. Vandenberg*, 2003–NMSC–030, ¶ 17, 134 N.M. 566, 81 P.3d 19. We will not disturb a district court's ruling on a motion to suppress evidence when it is supported by substantial evidence, unless the law was erroneously applied to the facts. *Walters*, 1997–NMCA–013, ¶ 8, 123 N.M. 88, 934 P.2d 282. Questions of law are reviewed de novo. *Hedicke v. Gunville*, 2003–NMCA–032, ¶ 9, 133 N.M. 335, 62 P.3d 1217. Questions of fact are reviewed to determine whether the district court's ruling is supported by substantial evidence when the facts are viewed in the light

most favorable to the prevailing party. *State v. Lopez,* 109 N.M. 169, 171, 783 P.2d 479, 481 (Ct.App.1989).

## DISCUSSION

{14} The Fourth Amendment of the United States Constitution protects the right of the people to be free from unreasonable searches and seizures. We first discuss whether the police conduct during the visit to Defendant's home constituted a seizure of Defendant for purposes of constitutional analysis. We conclude it did. Officer Moore compelled Defendant's participation in his investigation by using his authority as a police officer. He exercised that authority in a manner that would lead most innocent reasonable persons in Defendant's position to believe they were not free to leave or otherwise terminate the encounter.

{15} Next, we determine whether the seizure was unreasonable. We conclude the seizure was unreasonable. The seizure exceeded permissible constitutional limitations on the type of citizen participation police may compel. The seizure was not supported by reasonable suspicion and it was accomplished in an overly intrusive manner.

{16} Based on these conclusions, we hold the evidence Officer Moore obtained as a result of the visit to Defendant's home in the post-midnight hours was obtained in violation of Defendant's rights under the United States Constitution and must be suppressed.

### Police Contact With Defendant Constituted a Seizure

{17} When determining whether a person was seized, we evaluate (1) the circumstances surrounding the contact, including whether police used a show of authority; and (2) whether the circumstances of the contact reached "such a level of accosting and restraint that a reasonable person would have believed he or she was not free to leave." *State v. Affsprung,* 2004–NMCA–038, ¶ 6, 135 N.M. 306, 87 P.3d 1088 (internal quotation marks and citation omitted). For constitutional purposes, the phrase "free to leave" also includes whether the person who is approached by the police would feel free to disregard the officer or terminate the encounter. *See, e.g., id.* ¶ 16. "[W]hether a person was accosted and restrained in such a manner that a reasonable person in the same circumstances would believe he [or she] was not free to leave" is a question of fact. *Walters,* 1997–NMCA–013, ¶ 8, 123 N.M. 88, 934 P.2d 282.

{18} A seizure does not occur simply because a police officer approaches an individual and asks a few questions. The Fourth Amendment of the United States Constitution permits a police officer to approach an individual and ask a moderate number of questions "in order to investigate possible criminal behavior when the officer has a reasonable suspicion that the law has been or is being violated." *State v. Taylor,* 1999–NMCA–022, ¶ 7, 126 N.M. 569, 973 P.2d 246 (internal quotation marks and citation omitted). Police contact is consensual "[s]o long as a reasonable person would feel free to disregard the police and go about his business," or "to decline the officers' requests or otherwise terminate the encounter." *Florida v. Bostick,* 501 U.S. 429, 434, 439, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991) (internal quotation marks and citation omitted); *accord Walters,* 1997–NMCA–013, ¶¶ 12–13, 123 N.M. 88, 934 P.2d 282. For a contact requested by the police to remain consensual, the police are not permitted to "convey a message that compliance with their requests is required." *State v. Jason L.,* 2000–NMSC–018, ¶ 14, 129 N.M. 119, 2 P.3d 856 (internal quotation marks and citation omitted); *see also State v. Miller,* 80 N.M. 227, 229–30, 453 P.2d 590, 592–93 (Ct.App. 1969) (holding there is not a seizure of a person in a constitutional sense so long as the officer does not demand contact under color of authority).

{19} Contact becomes a seizure when police restrain the liberty of a person "by means of physical force or show of authority." *Terry v. Ohio,* 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *see also Jason L.,* 2000–NMSC–018, ¶ 14, 129 N.M. 119, 2 P.3d 856 (holding a consensual encounter is transformed into a seizure when police "convey a message that compliance with their requests is required" (internal quotation marks and citation omitted)). We have held

that a seizure occurs when there is either a "use of physical force by an officer or submission by the individual to an officer's assertion of authority." *State v. Sanchez*, 2005–NMCA–081, ¶ 10, 137 N.M. 759, 114 P.3d 1075 (internal quotation marks and citation omitted).

{20} The United States Supreme Court instructs courts to consider carefully the precise factual setting and circumstances of police contact because there is no "litmus-paper test for distinguishing a consensual encounter from a seizure." *Florida v. Royer*, 460 U.S. 491, 506, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). Rather,

> [t]he test is necessarily imprecise, because it is designed to assess the coercive effect of police conduct, taken as a whole, rather than to focus on particular details of that conduct in isolation. Moreover, what constitutes a restraint on liberty prompting a person to conclude that he is not free to "leave" will vary, not only with the particular police conduct at issue, but also with the setting in which the conduct occurs.

*Michigan v. Chesternut*, 486 U.S. 567, 573, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988).

{21} This Court "consider[s] the sequence of the officer's actions and how a reasonable person would perceive those actions." *Walters*, 1997–NMCA–013, ¶ 12, 123 N.M. 88, 934 P.2d 282. We have "noted that a seizure might be indicated" by some of the following: "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Id.* ¶ 18 (internal quotation marks and citation omitted). However, we must also take account of subtly coercive police actions. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 228–29, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). This inquiry presumes an objective test where "an innocent reasonable person" is the object of police contact, thereby rendering "the subjective perceptions of the particular individual" irrelevant. *Walters*, 1997–NMCA–013, ¶ 12, 123 N.M. 88, 934 P.2d 282.

{22} We have held that a seizure occurred after police knocked on the defendant's car window, asked the defendant to exit his vehicle, then proceeded to ask questions, because an innocent reasonable person would not feel free to leave or refuse the officer's requests. *State v. Boblick*, 2004–NMCA–078, ¶ 10, 135 N.M. 754, 93 P.3d 775. We have held a seizure occurred when a defendant was awakened by officers with a pat on the knee, and the officers then restrained the defendant's movement when he "came up fighting." *State v. Garcia*, 83 N.M. 490, 492, 493 P.2d 975, 977 (Ct.App.1971). In the Tenth Circuit, an individual's consent to search was invalidated because it was obtained after the individual was "routed" out of bed by a group of officers in the middle of the night. *Harless v. Turner*, 456 F.2d 1337, 1338–39 (10th Cir.1972).

{23} In this case, Officer Moore testified it was after midnight when he arrived at Defendant's home. He was dressed in full uniform when he knocked on the door. When Defendant's roommate answered the door, Officer Moore identified himself as an officer conducting an investigation of a two-day old traffic incident. He asked that Defendant be awakened and present himself. Defendant responded to Officer Moore's summons and came to the door. Officer Moore asked Defendant to step outside his home. "A knock at the door only ripens into a seizure when law enforcement officers use their *authority* ... to *command* the occupants to open the door." *United States v. Jerez*, 108 F.3d 684, 705 (7th Cir.1997) (internal quotation marks and citation omitted).

{24} Officer Moore undertook his contact with Defendant under the authority of his office and used his authority in a particularly compelling manner to initiate and structure his contact with Defendant. He required Defendant to be awakened after midnight with the news that a police officer was waiting at the door wanting his participation in an investigation. A person awakened in the middle of the night in response to a police request is particularly vulnerable. *See Jerez*, 108 F.3d at 690. Under such circumstances as indicated before us, in which the investigation concerned a two-day old traffic incident

that, as we later discuss, lacked any exigency allowing it to be conducted after midnight, we believe that Defendant was not free to exercise his own will.

{25} The district court suggested that a "person doesn't have to answer the door. If they do answer the door, they [can] say 'No thanks, I don't want to talk about it.' Whether it's a police officer or solicitor or someone else[.]" The State similarly construes Officer Moore's conduct as an "invitation" for Defendant to come to the door. As simple as the district court and the State tried to make this situation sound, their views do not describe the facts in this case where, with less reason than would support mailing a summons to Defendant, Officer Moore knocked on the door of Defendant's home after midnight, asked that he be awakened to present himself at the door, and then asked him to exit his home in furtherance of an official police investigation. A person is seized within the meaning of the Fourth Amendment "if a reasonable person would not have felt free to decline [the officers'] requests to open the door or to otherwise ignore the [officers'] presence." *Id.*

{26} The State also submits that our inquiry into whether Defendant felt "free to leave" should be limited by *Walters.* We disagree. The State leaves unanswered the question of *to where* a defendant intruded upon in his home while he slept could possibly feel "free to leave." *See, e.g., Bostick,* 501 U.S. at 436, 111 S.Ct. 2382 (holding that where a person has no desire to leave and would remain whether or not the police were present, the test is "whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter"). We believe most innocent, reasonable people are not likely to feel free to refuse police contact when they are awakened at a very late hour and told that the police are at the door specifically wanting to speak to them about an investigation. We expect that most innocent, reasonable people would conclude that police would compel their participation in an investigation at such an hour only in cases of emergency or clear necessity. As we later discuss, there was no emergency justifying Officer Moore's contact with De-

fendant after midnight. Under the totality of these circumstances in which the investigation involved a two-day old traffic incident, we thus conclude that Officer Moore's contact with Defendant amounted to an investigative seizure or detention and that constitutional protections against unwarranted search and seizure applied the moment Defendant was awakened in response to Officer Moore's command that he present himself at the door of his home. We next determine whether the seizure of Defendant's person was reasonable.

**Police Seizure of Defendant Was Not Reasonable**

{27} We determine whether a seizure violates the constitution under the facts of the case by balancing the degree and nature of the intrusion into the individual's privacy against the interest of the government in preventing and detecting crime. *Jason L.,* 2000–NMSC–018, ¶ 14, 129 N.M. 119, 2 P.3d 856. When a person is seized, the State must demonstrate that the facts, together with any rational inferences from those facts, reasonably support the invasion of a person's personal security. *Sanchez,* 2005–NMCA–081, ¶ 11, 137 N.M. 759, 114 P.3d 1075; *State v. Jones,* 114 N.M. 147, 150, 835 P.2d 863, 866 (Ct.App.1992).

{28} In this case, we consider two particular aspects of whether the seizure of Defendant constituted an unreasonable invasion of Defendant's privacy as secured by the Fourth Amendment. The first is whether the seizure was supported by reasonable suspicion. The second is whether the seizure reflected minimal police imposition on constitutionally-protected privacy and possessory interests.

{29} Seizures must be supported by reasonable suspicion. *See Affsprung,* 2004–NMCA–038, ¶ 19, 135 N.M. 306, 87 P.3d 1088. To determine whether the seizure was supported by reasonable suspicion, "our first inquiry is to determine what facts were available to [the officer] and what inferences logically flowed from those facts." *State v. Cobbs,* 103 N.M. 623, 626, 711 P.2d 900, 903 (Ct.App.1985). Next, we determine whether these facts "warrant a person of reasonable

caution in believing that criminal activity was possibly afoot." *Id.* at 627, 711 P.2d at 904; *see also State v. Prince,* 2004–NMCA–127, ¶ 10, 136 N.M. 521, 101 P.3d 332.

{30} Inarticulate hunches and unsupported intuition are insufficient to meet the reasonable suspicion standard. *State v. Galvan,* 90 N.M. 129, 131, 560 P.2d 550, 552 (Ct.App.1977); *see also State v. Montoya,* 94 N.M. 542, 544, 612 P.2d 1353, 1355 (Ct.App. 1980) (noting that "an awareness of specific articulable facts, together with rational inferences," must underlie the suspicion required to justify "intrusion into a sphere in which the defendant could maintain a reasonable expectation of privacy"). Last, "[r]easonable suspicion must exist at the inception of the seizure" and "cannot rely on facts which arise as a result of the encounter." *See Jason L.,* 2000–NMSC–018, ¶ 20, 129 N.M. 119, 2 P.3d 856.

{31} Where reasonable suspicion is present, police intrusions "should minimize the imposition on privacy and possessory interests protected by the Fourth Amendment." *State v. Wagoner,* 1998–NMCA–124, ¶ 14, 126 N.M. 9, 966 P.2d 176. Such intrusions must be limited in scope to the circumstances that initially justified the contact. *State v. Romero,* 2002–NMCA–064, ¶ 10, 132 N.M. 364, 48 P.3d 102. The methods employed by police "should be the least intrusive means reasonably available to verify or dispel the officer's suspicion." *Taylor,* 1999–NMCA–022, ¶ 25, 126 N.M. 569, 973 P.2d 246 (internal quotation marks and citation omitted).

{32} In general, persons are entitled to a greater expectation of privacy in their homes. In *Wagoner,* we recognized that "evidence supporting the need for a warrantless entry [into a home] should be *stronger* when the suspected crime is a misdemeanor than when it is a felony." 1998–NMCA–124, ¶ 21, 126 N.M. 9, 966 P.2d 176 (emphasis added). The Tenth Circuit has articulated that the warrantless arrest in a person's home for a minor traffic violation was an unreasonable seizure under the Fourth Amendment. *Howard v. Dickerson,* 34 F.3d 978, 982 (10th Cir.1994). Police en-

counters at a person's dwelling in the middle of the night are especially intrusive and must be examined with great caution. *See Jerez,* 108 F.3d at 690–91. Police contacts that occur at night involve a greater degree of intrusion than those that occur in the daytime. *See State v. Garcia,* 2002–NMCA–050, ¶ 16, 132 N.M. 180, 45 P.3d 900. At common law, nighttime searches were "regarded with revulsion" because of the indignity of rousing people from their beds. *See, e.g., Commonwealth v. DiStefano,* 22 Mass.App.Ct. 535, 495 N.E.2d 328, 332 (1986). Today, we require separate reasonable cause for authorization to execute a nighttime search. *See* Rule 6–208(B) NMRA. This requirement recognizes that, "the greater intrusion of a nighttime entry must be offset by a greater showing of need." *See Garcia,* 2002–NMCA–050, ¶ 16, 132 N.M. 180, 45 P.3d 900 (internal quotation marks and citation omitted). "[T]he true test of the constitutionality of a nighttime search is whether it was necessary to make the search at that time." *Id.* (internal quotation marks and citation omitted). As noted above in our discussion of the extent to which Officer Moore's conduct constituted a seizure, the nighttime encounter contributed to the conveying of a message that compliance with his "request" to come to the door was required.

{33} When Officer Moore went to Defendant's home, he was operating on no more than a possible ownership connection between Defendant and the motorcycle. His presence was based solely upon having the name and address of the registered owner of a red motorcycle with a license number that mostly matched what he had recorded the morning of the incident. Officer Moore's testimony was clear that the evidence he had linking Defendant to what he had seen the morning of the incident was insufficient for him to feel comfortable mailing Defendant a summons. He did not have any information as to whether Defendant was the person Officer Moore had observed driving the motorcycle two days earlier. As a result, the evidence Officer Moore believed insufficient to mail Defendant a summons comprises the very facts and inferences Officer Moore needed to establish the reasonable suspicion

necessary to justify further investigation by seizing Defendant's person.

{34} The district court concluded that Officer Moore had reasonable suspicion "to go to the door, especially once he walked up and saw a red motorcycle on the porch, it's not conclusive on it, but that's some additional factor that [Officer Moore] was at the right place and [Defendant was] the right person to investigate." The district court also stated as it ruled, "I don't find that there's any requirements, either under the law or the constitution ... to have reasonable suspicion [or] probable cause before commencing the investigation."

{35} We find it difficult to reconcile the district court's comments with Officer Moore's testimony. Officer Moore testified he intended to go to the house "in hopes of making contact or at least observing a motorcycle there or making contact with the owner" and that he had no idea whether the owner of the motorcycle was the driver he had observed. Officer Moore also testified that when he approached Defendant's door and saw a motorcycle on the front porch, he did not then "check that vehicle or make any kind of determination whether that vehicle was the one [he] had seen.... [He] simply saw that motorcycle and continued on." We deduce from his testimony that Officer Moore did not check the license plate of the motorcycle on the porch against the registration he had earlier obtained. Thus, we do not agree with the district court's view of this evidence as supporting reasonable suspicion, and hold that insufficient evidence exists to support a finding of reasonable suspicion on Officer Moore's part.

{36} Furthermore, there was no exigency to justify Officer Moore's visit to Defendant's home after midnight to investigate a two-day old misdemeanor traffic violation. None of the common exigencies such as officer safety, a danger of dissipated or destroyed evidence, or offender flight required immediate action in this case. Two days had already elapsed. The only rationale Officer Moore cited for his visit was his belief that someone was likely to be at home (without regard that Defendant might be sleeping) and that he commonly responded to calls during a typical midnight shift.

{37} Looking at the totality of the circumstances involved in Officer Moore's pursuit of this traffic violation, Officer Moore's intrusion exceeds both the governmental interest in pursuing the violation and the minimal level of intrusion that should be permitted in its investigation. *See Jason L.*, 2000–NMSC–018, ¶ 14, 129 N.M. 119, 2 P.3d 856. As noted in *Wagoner*, the justification for an investigative encounter at a defendant's home should be commensurately greater when the offense itself is a petty misdemeanor. 1998–NMCA–124, ¶ 21, 126 N.M. 9, 966 P.2d 176. In this case, we are not only dealing with a petty misdemeanor—we are dealing with a *two-day-old* petty misdemeanor.

{38} The State said it could find no case limiting Officer Moore's conduct, but "[m]aybe it sort of violates some sort of personal sense of what public officials should do." The district court said, "[i]t may be impolite, may[be] even boorish." However, it found no problem with Officer Moore's actions, citing to *United States v. Fisch*, 474 F.2d 1071 (9th Cir.1973), for the proposition that although neither neighborly nor genteel, officers listening to conversations through a hotel room door was not constitutionally prohibited. However, the facts of *Fisch* are readily distinguishable. In that case, the court found that the defendants had no expectation of privacy because the defendants were loud enough to be overheard by the passive surveillance from the next room. *Id.* at 1077. Unlike *Fisch*, however, this case involved nothing passive on Officer Moore's part, and was not a case of Defendant's exposing himself to Officer Moore's investigation but of Officer Moore's using the weight of his official mien to compel Defendant's presence.

{39} The State makes much of an argument that Officer Moore was "authorized" to go onto Defendant's front porch and initiate contact with Defendant. However, in concluding that Defendant was unconstitutionally seized, we have given the most weight to the nature and underlying justification for seizing Defendant and not the location of the contact.

{40} In conclusion, when Officer Moore used his authority to compel Defendant to be awakened and to exit his home, Officer Moore was not basing his actions on a reasonable suspicion that Defendant was the perpetrator of the traffic violation Officer Moore had witnessed two days earlier. Absent reasonable suspicion, and in view of the minor nature of the two-day-old offense that was the subject of Officer Moore's seizure of Defendant, we conclude that police intrusion into Defendant's security was unconstitutionally intrusive. We hold Officer Moore's seizure of Defendant violated Defendant's constitutional protection against unwarranted searches and seizures.

### Evidence Must Be Suppressed

{41} Under the exclusionary rule, unconstitutionally obtained evidence is inadmissible at trial. *State v. Gutierrez,* 2004–NMCA–081, ¶ 6, 136 N.M. 18, 94 P.3d 18. As such, evidence obtained as the result of an illegal detention must be suppressed. *See, e.g., Prince,* 2004–NMCA–127, ¶¶ 20–21, 136 N.M. 521, 101 P.3d 332. Here, the result of Defendant's exiting the house on Officer Moore's request was that Officer Moore acquired evidence he would not have otherwise had but for his illegal conduct. We have held that Officer Moore's seizure of Defendant was unconstitutional. Therefore, the evidence police obtained as a result is inadmissible.

## CONCLUSION

{42} Having held that Defendant was seized without reasonable suspicion and that the evidence obtained as a result of Defendant's illegal detention must be suppressed, we reverse the district court's denial of Defendant's motion to suppress. We remand this case for further proceedings consistent with this opinion.

{43} **IT IS SO ORDERED.**

WE CONCUR: A. JOSEPH ALARID and JAMES J. WECHSLER, Judges.