2007-NMCA-006

149 P.3d 961

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**Peter A. VARGAS, Defendant–Appellant.**

**No. 24,880.**

Court of Appeals of New Mexico.

Nov. 9, 2006.

Certiorari Granted, No. 30,131,
Dec. 14, 2006.

Patricia A. Madrid, Attorney General, Katherine Zinn, Assistant Attorney General, Santa Fe, NM, for Appellee.

John Bigelow, Chief Public Defender, Cynthia S. Sully, Assistant Appellate Defender, Santa Fe, NM, for Appellant.

## OPINION

ALARID, Judge.

{1} This case presents an opportunity to clarify the requirements of the knock-and-announce rule. We hold that the announcement component of the knock-and-announce rule requires officers executing an arrest warrant to inform the occupants of a residence that the officers are proceeding pursuant to a warrant. We further hold that unless and until officers have announced that they are executing a warrant, an occupant's refusal to admit the officers into a residence does not automatically render futile further announcement of the officers' purpose and authority nor does it constitute a per se exigency excusing compliance with the announcement component of the knock-and-announce rule.

## BACKGROUND

{2} During the swing shift on December 3, 2002, Patrol Sergeant Chris Miller of the Las Cruces Police Department learned that there was an unexecuted bench warrant authorizing Defendant's arrest for failure to appear in district court to answer a felony charge of battery on a peace officer. Sergeant Miller had encountered Defendant the previous day in municipal court, but at that time had not known of the felony warrant. Sergeant Miller checked computer records, which gave two addresses for Defendant. Sergeant Miller contacted dispatch and requested that they send officers to both addresses to execute the warrant.

{3} Officer Robert Elrick was directed to execute the warrant. Dispatch did not disclose the specific underlying felony charge. The dispatcher provided a general description of the subject: adult male, medium build, with a ponytail and goatee. Officer Frank Flores was on duty and was listening in on his radio and on his own initiative decided to assist Officer Elrick. Officers Elrick and Flores were aware that they were being sent to a possibly out of date, "secondary" address and that at the same time they were attempting to execute the warrant, a larger team of officers would be attempting to execute the warrant at a more recent address. Officers Elrick and Flores did not consider it likely that they would encounter the subject at the secondary address. Other officers listening in on the dispatch advised Officers Elrick and Flores that the subject of the warrant was involved in drugs and that he might fight them. Officers Elrick and Flores had no other information suggesting that the subject was armed or dangerous. Officer Flores was a team leader for a SWAT team. In his view, the attempt to execute the warrant was "nothing like" a SWAT situation. A "high risk warrant" would have been assigned to a tactical unit for execution, not to a single patrol officer.

{4} Officer Elrick was wearing a standard uniform with a metal badge. Officer Flores was dressed in a navy blue bike uniform with shorts, a yellow cloth badge, and a leather Sam Browne belt with his equipment and gun. The officers arrived at the address provided by dispatch around 8:00 p.m. The address was an apartment building.

{5} The officers approached the door to the subject's apartment, and, as a routine safety precaution, stationed themselves off to the sides of the door, with Officer Elrick on the right, doorknob side and Officer Flores on the left side of the door. The officers did not engage in any reconnaissance other than to pause momentarily to listen for voices or other sounds inside the apartment. The officers heard two voices, one of which was male. As Officer Elrick was preparing to knock, the door was opened from the inside by a man whose appearance matched the general description of the subject given by the dispatcher. The man remained behind the door, inside the threshold of the apartment. Officer Elrick said "Hi, how ya' doin'," or "Hey bro', how ya doin'?" The man exclaimed "Oh shit!" and attempted to shut the door. Officer Elrick and Officer Flores each blocked the door with a foot. Officer Flores, shouted "don't close the door, don't close the door!" As the man struggled to shut the door, Officer Flores saw a "bluish-purplish, dark-colored blur" move across the man's body. The movement was followed by a "loud thump" consistent with an object of significant weight hitting the floor. The officers were concerned that the thump might have been the sound of a firearm hitting the floor. The man let go of the door and Officer Flores entered the apartment with his gun drawn, followed by Officer Elrick. Officer Flores did not announce his purpose or authority prior to entering the apartment; indeed, Officer Flores's practice was to not disclose the existence of an arrest warrant to a person answering the door due to his concern that the subject of the warrant would "take off" if he realized that officers were present to make an arrest.

{6} In addition to the man, the officers encountered a woman, who was reclining on a couch as the officers entered. The man angrily complained to the officers that they had "just busted into the apartment," and "had no reason for being there." The man asked Officer Flores "what are you doing, breaking into my house?" The officers ordered the man and woman to sit on the couch while they confirmed the man's identity. The man complied with all the commands

that were given to him by the officers after they entered.

{7} Upon entering the apartment, Officer Elrick immediately looked for the object that had made the thump. He located and retrieved a Crown Royal bag. He felt a square, solid object within the bag. He looked in the opening of the bag to determine if the object was a gun. He observed a green, leafy substance that he thought might be marijuana. He emptied the bag and discovered marijuana, cocaine, scissors, and an electronic scale.

{8} As Officer Elrick was securing the Crown Royal bag, Officer Flores was confirming that the man in the apartment was the subject of the warrant. The man told Officer Flores his name was Peter Vargas. He gave Officer Flores his date of birth and social security number. The man and the woman claimed that the man had "taken care" of the warrant. Based on his past experience, Officer Flores was skeptical. The woman showed Officer Flores paperwork establishing that a Peter Vargas had appeared in magistrate and municipal court the day before. However, the warrant numbers on the paperwork did not match the warrant that the officers were executing. The officers handcuffed the man, now identified as Defendant, and arrested him.

{9} Defendant was indicted by a grand jury and charged with narcotics trafficking, possession of drug paraphernalia, and possession of marijuana. Defendant moved to suppress the evidence seized by Officers Elrick and Flores, arguing, *inter alia*, that the officers violated the knock-and-announce rule as set out in *State v. Attaway*, 117 N.M. 141, 870 P.2d 103 (1994), when they "immediately barged" into his apartment. In response, the State argued that the officers were proceeding pursuant to an arrest warrant; that the officers' observation of Defendant when he opened the door gave them reason to believe that the subject of the warrant was present in the apartment; and that Defendant's attempt to shut the door coupled with the loud thump gave rise to exigent circumstances allowing them to pursue Defendant inside the apartment. The district court held an evidentiary hearing at which Sergeant Miller, Officer Elrick and Officer Flores testified. The district court found, *inter alia*, that:

1. As officers moved to knock, the door was opened by a man matching the general description of the man sought to be arrested pursuant to a bench warrant. That man said, "oh shit" on seeing the two men, who w[ere] dressed as police officers, and attempted to shut the door.

2. Due to the particular facts of this case, it would be inappropriate and unsafe to require the officers to allow the door to be shut and then knock and announce their presence and purpose.

3. The move made by the officers inside the door to identify that man (who later turned out to be the defendant) was justified by concern for officer safety.

Following the denial of his motion to suppress, Defendant entered a conditional guilty plea to the trafficking count, reserving the right to appeal the denial of his motion to suppress.

## DISCUSSION

{10} In reviewing a ruling granting or denying a motion to suppress, we apply the deferential standard of review adopted by our Supreme Court. *State v. Lopez*, 2005–NMSC–018, ¶ 9, 138 N.M. 9, 116 P.3d 80.

{11} In *Attaway*, 117 N.M. at 150, 870 P.2d at 112, our Supreme Court held that Article II, Section 10 of the New Mexico Constitution requires law enforcement officers executing a warrant to knock and announce their identity and purpose prior to entering the premises that are the subject of a search warrant. Shortly after our Supreme Court decided *Attaway*, the United States Supreme Court held that the knock-and-announce principle is a component of the reasonableness inquiry under the Fourth Amendment of the United States Constitution. *Wilson v. Arkansas*, 514 U.S. 927, 929, 115 S.Ct. 1914, 131 L.Ed.2d 976 (1995). We have held that the knock-and-announce rule applies to the execution of arrest warrants as well as search warrants. *State v. Halpern*, 2001–NMCA–049, ¶ 9, 130 N.M. 694, 30 P.3d 383.

{12} It is well settled that absent consent, exigent circumstances, or hot pursuit, police officers may not enter a suspect's residence to effect an arrest without a warrant. *See Payton v. New York*, 445 U.S. 573, 576, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). Where a warrant is required, a police officer who enters a private residence without permission and without a warrant "is little more than a trespasser." *Dickens v. State*, 59 So.2d 775, 775 (Fla.1952). A person present within his or her home may decline to enter into a citizen-police encounter by not answering the door or, if the person has previously answered the door, the person may terminate the citizen-police encounter simply by shutting the door. *See Cummings v. City of Akron*, 418 F.3d 676, 686–87 (6th Cir.2005) (concluding that police officers violated homeowner's Fourth Amendment rights by blocking his attempt to shut his front door and forcing their way into his home where the entry was not supported by a warrant, exigent circumstances, or hot pursuit). In short, without a warrant and in the absence of exigent circumstances, police may request entry, but they may not demand entry as a matter of right. "Get a warrant" remains a potent response to a request by police to enter a private residence.

{13} Warrants are issued in ex parte proceedings. *State v. Maes*, 2003–NMCA–054, ¶ 7, 133 N.M. 536, 65 P.3d 584. Typically, a person first learns that his or her person or residence is the subject of a warrant when the person is advised by the officers executing the warrant of the existence of the warrant. Unless and until police announce that they are proceeding under the authority of a warrant, a person may have no way of knowing whether he must accede to an intrusion into his home or whether he has the constitutional right to refuse entry. Thus, an essential item of information conveyed by an announcement is the existence of a warrant authorizing a non-consensual entry:

> But before he breaks it, he ought to signify the cause of his coming, and to make request to open doors ..., for the law without a default in the owner abhors the destruction or breaking of any house (which is for the habitation and safety of man) by which great damage and inconvenience might ensue to the party, *when no default is in him; for perhaps he did not know of the process, of which, if he had notice, it is to be presumed that he would obey it[.]*

*Wilson*, 514 U.S. at 931–32, 115 S.Ct. 1914 (quoting *Semayne's Case*, 77 Eng. Rep. 194, 195–96 (K.B.1603) (emphasis added)).

{14} We recognize that in the past we have stated that "once the occupants have voluntarily opened the door to uniformed officers, the requirements of the knock and announce rule are satisfied." *State v. Chandler*, 119 N.M. 727, 735, 895 P.2d 249, 257 (Ct.App.1995). In making this statement, we appear to have given insufficient consideration to a person's constitutional right to deny entry to officers desiring to enter private premises without a warrant. We therefore qualify our statement in *Chandler*. Where the lawfulness of a non-consensual entry into a residence or other private premises depends upon the authority conferred by a warrant, the announcement component of the knock-and-announce rule necessarily includes a requirement that officers executing a warrant announce that they are present under the authority of a warrant-e.g., "we have a warrant." In such cases, a mere announcement of police presence without reference to the warrant does not alert the occupants of a residence to the executing officers' authority to effect a non-consensual entry under the warrant. "[T]he policemen must identify themselves as police *and indicate that they are present for the purpose of executing a search warrant. It is not enough that by knocking on the door or in some other way the occupant has been made aware that someone is outside.*" 2 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 4.8(c) at 671 (4th ed.2004) (footnote omitted; emphasis added).

{15} In this case, Defendant appears to have been alerted to the presence of the police officers when he opened the door. His exclamation of "Oh shit!" strongly suggests that Defendant, who was in possession of illegal drugs at the time, and understandably, would have desired to avoid an encounter with police, recognized that the persons confronting him were uniformed police officers.

We agree with the State that on the facts of this case the officers were not required to knock and announce their *presence.* To the extent the knock-and-announce rule is designed to insure that the subject of a warrant is aware of the presence of police outside his residence, Defendant's own actions in opening the door and observing the uniformed officers satisfied that part of the rule. But as we have noted above, a constitutionally adequate announcement alerts the occupant to the fact that the officers are acting under the authority of a warrant, not merely to their presence. LaFave, *supra,* at § 4.8(f) (observing that "there is no good reason for concluding, as some courts have done, that the occupants are aware of the authority *and* purpose merely because the police knew that someone within had seen them approaching or that someone outside had shouted something into the premises") (footnote omitted). Here, there is no dispute that the officers did not refer to the arrest warrant prior to forcing entry.[1] This case, therefore, turns upon whether the facts known by the officers justified the officers in dispensing with an announcement of their purpose and authority.

{16} We reject the State's argument that the occupant's · surprise upon seeing the officers and his attempt to immediately close the door rendered further compliance with the announcement component of the knock-and-announce rule a useless gesture. Officers executing a warrant are excused from announcing their purpose and authority where facts known to the officer "justify them in being virtually certain that the [subject] already knows their purpose so that an announcement would be a useless gesture." *See Miller v. United States,* 357 U.S. 301, 310, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958) (discussing futility exception to the common-law announcement rule). We decline to adopt a presumption that a homeowner who peacefully opposes an apparently warrantless (and therefore apparently *unlawful*) entry necessarily will resist the authority of a warrant. *See Semayne's Case,* 77 Eng. Rep. at 196 (presuming that a homeowner will obey the authority of a warrant). Where an occu-

pant's conduct in shutting a door or otherwise denying consent to enter private premises is consistent with his assertion of Fourth Amendment rights, officers must be aware of other facts that reasonably justify them in assuming that the occupant would refuse to accede to the authority of a warrant before foregoing an announcement of their purpose and authority on the ground of futility.

{17} It is well established that, apart from futility, compliance with the knock-and-announce rule may be excused by exigent circumstances. *Lopez,* 2005–NMSC–018, ¶ 10, 138 N.M. 9, 116 P.3d 80. Whether officers were confronted with exigent circumstances sufficient to excuse compliance with the knock-and-announce rule is a mixed question of fact and law. *Id.* ¶ 11. We defer to the district court's findings of historical fact if supported by substantial evidence. *Id.* ¶ 9. We review de novo the constitutional question of whether the district court correctly balanced individual privacy interests against the State's interest in effective law enforcement. *Id.* ¶ 11.

{18} The initial Fourth Amendment/Article II, Section 10 intrusion occurred when Officers Elrick and Flores placed their feet between the doorjamb and door to prevent Defendant from shutting the door. *See State v. Reynaga,* 2000–NMCA–053, ¶ 9, 129 N.M. 257, 5 P.3d 579; *State v. Maland,* 140 Idaho 817, 103 P.3d 430, 434 (2004); *State v. Larson,* 266 Wis.2d 236, 668 N.W.2d 338, 342 (Ct.App.2003); *State v. Robinson,* 103 Ohio App.3d 490, 659 N.E.2d 1292, 1295 (1995); *see also Halpern,* 2001–NMCA–049, ¶ 14, 130 N.M. 694, 30 P.3d 383 (observing that "[t]he protections of the Fourth Amendment and Article II, Section 10 place a priority on protection of the home, and draw 'a firm line at the entrance to the house' ") (quoting *Payton,* 445 U.S. at 590, 100 S.Ct. 1371). If this initial intrusion into Defendant's home was unlawful, then Defendant's subsequent actions cannot be relied upon to establish exigent circumstances justifying the initial intrusion. *Reynaga,* 2000–NMCA–053, ¶ 14,

---

1. Indeed, as previously noted, it appears to have been Officer Flores's standard practice in serving arrest warrants not to announce his purpose.

129 N.M. 257, 5 P.3d 579. Thus, the crucial question in this case is whether exigent circumstances justifying noncompliance with the knock-and-announce rule existed *at the point that Officers Elrick and Flores crossed the threshold of the apartment.* Here, officer safety was the sole law enforcement interest relied on by the district court to justify an unannounced entry by force.

{19} At the point that the officers crossed the threshold of the apartment, the officers were aware that: (1) the subject of the warrant had failed to appear in district court on an undisclosed felony charge; (2) the subject of the warrant might be involved with illegal drugs; (3) under certain circumstances, the subject of the warrant might fight officers; (4) the occupant who answered the door matched the description of the subject of the warrant and was surprised to find police officers outside his door; and (5) the occupant attempted to avoid contact with the officers by shutting the door.

{20} The first two factors—probable cause to believe Defendant had committed a felony and reason to believe that Defendant was involved with illegal drugs—are routinely present in any case in which police are executing a warrant related to a felony drug offense. It is well-established that knowledge regarding the general propensity of drug dealers to arm themselves or to resist police ordinarily is not sufficient of itself to excuse compliance with the announcement requirement. *Lopez,* 2005–NMSC–018, ¶ 8, 138 N.M. 9, 116 P.3d 80; *Attaway,* 117 N.M. at 152, 870 P.2d at 114. Here, Officers Elrick and Flores—the officers actually executing the warrant—had not been advised that the subject of the warrant had been charged with battery on a police officer and had no information, other than his possible involvement with unknown amounts and types of illegal drugs, that the subject of the warrant might be armed with a dangerous weapon.[2]

{21} The State argues that we should treat Defendant's surprise and his attempt to shut the door in response to seeing the officers as exigent circumstances excusing an announcement. The State fails to recognize that, as we have noted above, shutting a door can be an assertion of constitutional rights.

> [The defendant] communicated to the officers the limited scope of his consent ... when he attempted to bar the officers' entry into the apartment by closing the door, and the officers exceeded the scope of [the defendant's] voluntary consent when they forced their way over the threshold and into the apartment.

*Robinson,* 659 N.E.2d at 1295. Generally, a person's assertion of his Fourth Amendment rights is not probative of "guilt, suspicion, or dangerousness." *State v. Vandenberg,* 2003–NMSC–030, ¶ 46, 134 N.M. 566, 81 P.3d 19. It would be "anomalous" to treat a person's refusal to consent to an apparently warrantless intrusion into his home as a circumstance justifying dispensing with another component of the Fourth Amendment/Article II, Section 10's protection against unreasonable searches and seizures. *Cf. State v. Garcia,* 2005–NMSC–017, ¶ 31, 138 N.M. 1, 116 P.3d 72 (observing that a person's exercise of the constitutional and statutory right to bear arms by itself cannot support a reasonable suspicion that he is both armed and dangerous). Due to the absence of an announcement of the officers' purpose and authority, Defendant's attempt to shut the door did not constitute an exigency per se.

{22} The State suggests that we defer to the opinions of Officers Elrick and Flores, who testified that they perceived Defendant's conduct in attempting to shut the door as a threat to their physical safety. While we agree that the testimony of these officers is important evidence, it cannot be dispositive of itself of reasonableness in the constitutional sense. Due to training and work experience, law enforcement officers

---

**2.** From information in the record proper documenting Defendant's prior convictions, it appears to a near certainty that Defendant is the same Peter Vargas whose convictions we affirmed in *State v. Vargas,* 121 N.M. 316, 910 P.2d 950 (1995). In that case, we upheld a forceable entry made simultaneously with the announcement of the executing officers' presence and purpose based on evidence that would give reasonably well-trained officers grounds to believe that the defendant and his brother would be armed and dangerous. The facts that are documented as a matter of public record in *Vargas I* were not communicated to Officers Elrick and Flores.

perceive the world differently than do civilians:

> [P]olice work ... by its nature, puts officers in personal jeopardy, and often requires officers to assert authority over others.... [T]hese two phenomena—personal danger and the need to assert authority—deeply affect officers' views of the world.... 'Working together, the factors of danger and authority tend to make police officers constantly vigilant, suspicious, and ready to assert dominant authority' over civilians in situations where an officer's authority is questioned in even the most minor of ways. Necessarily, it would appear, the same vigilance that officers apply to detect criminality as part of their work becomes a "fact of life" for their interactions with the broader public.

Eliot Spitzer, Office of the Attorney Gen. of the State of N.Y., *The New York City Police Department's "Stop & Frisk" Practices: A Report to the People of the State of New York From The Office Of The Attorney General* 67 (1999) (footnotes omitted). The magnitude of the harm in a worst case scenario—death or serious physical injury—understandably encourages an attitude that it is better to treat every citizen-officer encounter as potentially threatening rather than risk overlooking a single actual threat to the officer's personal safety. A purely police-centric standard of objective reasonableness can be expected to be significantly over-inclusive in the perception of threat, and, in conjunction with the already-relaxed constitutional standard,[3] is likely to result in a large number of intrusions into the privacy of persons who in fact pose no actual threat to police, but whose conduct is perceived as threatening or uncooperative from the better-safe-than-sorry viewpoint of law enforcement officers. We are also concerned that a purely police-centric standard will shortchange individual privacy interests by viewing constitutional limitations on police discretion largely as impediments to safety. Thus, although evidence of what law enforcement authorities

deem an appropriate and professionally reasonable response to perceived threatening conduct is a factor to be considered, it cannot be dispositive by itself of the constitutional reasonableness of police conduct—particularly when the perceived threatening or noncompliant conduct is consistent with the subject's assertion of constitutional rights.

{23} The one circumstance known to Officers Elrick and Flores that clearly stands out was an unidentified officer's opinion that Defendant might fight. Although this circumstance would have justified a reasonable officer in exercising caution,[4] it is not clear to us that this circumstance necessarily weighs in favor of dispensing with an announcement of the officers' purpose and authority. Reasonable officers will be alert to the possibility that reflexive, immediate resort to force is not always the best course and that an unannounced entry by force may increase, rather than reduce, the risk of harm as compared to an entry after full compliance with the knock-and-announce rule. By bursting into Defendant's home without announcing their purpose and authority, the officers deprived Defendant of the opportunity to peacefully accede to the authority of the warrant. *See Reynaga*, 2000–NMCA–053, ¶ 12, 129 N.M. 257, 5 P.3d 579 (observing that "it is the state of mind of occupants who have conceded the right of the police to enter that reduces the potential for violence"). Reasonable officers would have recognized that bursting into a home without consent and without an announcement of purpose and authority is precisely the type of conduct that can be expected to provoke an instinctive defensive response from a peaceful homeowner. *See Hudson v. Michigan*, —— U.S. ——, ——, 126 S.Ct. 2159, 2165, 165 L.Ed.2d 56 (2006) (noting that protection of human life and limb is an interest furthered by the knock-and-announce rule "because an unannounced entry may provoke violence in supposed self-defense by the surprised resident").

---

**3.** Reasonable suspicion "falls considerably short of satisfying a preponderance of the evidence standard." *United States v. Arvizu*, 534 U.S. 266, 274, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002).

**4.** We assume that the unidentified officer would not have advised Officers Elrick and Flores that

Defendant "might fight them" if he had meant to communicate his belief that Defendant would resist arrest with deadly force and that Officers Elrick and Flores would have understood the officer's warning as a reference to possible resistance not involving deadly force.

{24} It is important to distinguish this case from cases involving search warrants and cases involving occupants who are reasonably believed to be armed and dangerous. When officers are executing a search warrant and have reason to believe that the occupants of a premises will destroy evidence or contraband that is the subject of a search warrant, the officers must act quickly to prevent the loss of the items that are the subject of the warrant. Ordinarily, this requires the officers to enter the premises and physically separate the occupants from the items that are the subject of the warrant. Similarly, when officers executing a search or arrest warrant have reason to believe that the occupants are armed and dangerous, the officers must enter the premises in order to deny the occupants the use of their weapons, either by securing the weapons or restraining the occupants. In these cases, the executing officers are, in effect, engaged in a footrace with the occupants in which time is of the essence. In contrast, officers executing an arrest warrant can anticipate and prevent the escape of the arrestee without engaging in any Fourth Amendment/Article II, Section 10 intrusion simply by stationing officers at strategic locations *outside* the subject's residence. Where, as here, the officers were not executing a search warrant and had not been informed of facts suggesting that Defendant was armed and dangerous or particularly likely to flee, the case for dispensing with a full announcement on grounds of temporal exigency is much less clear.

{25} We of course may not engage in a "divide-and-conquer analysis" in which we consider each allegedly exigent circumstance out of context, dismissing that particular circumstance as insufficient of itself to justify the actions of the law enforcement officers. *State v. Vandenberg*, 2002–NMCA–066, ¶ 32, 132 N.M. 354, 48 P.3d 92 (Pickard, J., dissenting) (internal quotation marks omitted), *rev'd* 2003–NMSC–030, 134 N.M. 566, 81 P.3d 19. Whether exigent circumstances justifying an unannounced entry were present must be judged under the "totality of the circumstances." *Lopez*, 2005–NMSC–018, ¶ 16, 138 N.M. 9, 116 P.3d 80. This standard requires us to consider in the aggregate all exigent circumstances "found or *impliedly* found" by the district court that

were known to the executing officers at the time of entry. *Id.* ¶ 22 (internal quotation marks omitted). While we have separately discussed the factors relied on by the State, we have also considered them in the aggregate in determining whether the totality of the circumstances excused the officers from announcing their purpose and authority prior to entering.

{26} The Fourth Amendment and Article II, Section 10 protect the people against *unreasonable* searches and seizures. Because the crucial modifier "unreasonable" is not self-defining and because searches and seizures occur in innumerable and varied factual contexts, the line between reasonable and unreasonable searches and seizures is drawn by judicial decisions. Fourth Amendment/Article II, Section 10 analysis of police conduct is to a considerable extent a matter of circular, "chicken or the egg," reasoning: does police practice prescribe what expectations of privacy are constitutionally reasonable, or do judicial rulings validating expectations of privacy as reasonable prescribe police practice? When a court denies a motion to suppress, it is deciding that the officers' view of the world was reasonable and that the individual's expectation of being free of the particular intrusion was unreasonable. When a court grants a motion to suppress, it is validating an expectation of privacy as reasonable and simultaneously deciding that the officers' conduct was unreasonable under the circumstances. The reality and the irony of search and seizure jurisprudence is that the rights of law-abiding citizens to go about their daily activities free of random and arbitrary intrusions by law enforcement officials is primarily determined by rulings on motions to suppress evidence filed by the defendants in criminal cases, and not by judgments in civil rights cases vindicating a citizen's expectation of privacy as reasonable: "[i]t is a fair summary of history to say that the safeguards of liberty have frequently been forged in controversies involving not very nice people." *Florida v. Riley*, 488 U.S. 445, 463–64, 109 S.Ct. 693, 102 L.Ed.2d 835 (1989) (Brennan, J., dissenting) (quoting *United States v. Rabinowitz*, 339 U.S. 56, 69, 70 S.Ct. 430, 94 L.Ed. 653 (1950) (Frankfurter, J., dissenting) (internal quota-

tion marks and brackets omitted), *overruled by Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969)).*

{27} We offer the following in response to the dissent.

{28} Because reasonableness is fact specific, it is essential that a court base its reasonableness analysis on the record. Here, the timing of events is critical to the analysis of the constitutionality of the unannounced entry. Although the dissent states that "Defendant *disobeyed* the commands of uniformed officers immediately *before* their entry into his apartment," (emphasis added), *see* dissent ¶ 45, a careful review of the record establishes that at the point in time that Defendant began to shut the door the only thing the officers had said was "Hi, how ya' doin" or "Hey bro', how ya doin'?" Defendant could not have disobeyed the officers' commands when he began to shut the door, because the officers had not ordered him to do anything at that point. The officers blocked the doorway *in response to* Defendant's entirely lawful [5] attempt to shut the door. Even if the ensuing struggle (which Defendant himself peacefully terminated after a few seconds) can be characterized as unlawful, *see* NMSA § 30–22–1(D) (1981), that conduct cannot retroactively justify the officers' decision to enter Defendant's apartment in order to block the doorway.

{29} The dissent, in our opinion, significantly understates the character of the privacy interests implicated by the officers' entry by force and with guns drawn. First, the dissent's approach largely ignores the privacy interests of the other occupant(s). Second, the dissent ignores a homeowner's important privacy interest in excluding unwanted visitors. Unless and until officers have announced that they are present under the authority of a warrant, they are not situated any differently from any other unwelcome visitor from the standpoint of the homeowner. From a homeowner's standpoint, a stranger's use of force to prevent the homeowner from shutting the door is a serious invasion of privacy. Third, the dissent ignores the interest of both the subject of the warrant and any other occupants in not being unnecessarily subjected to threats of deadly force. The experience of being ordered about one's own home by armed strangers shouldn't be dismissed as a *de minimis* intrusion.

{30} When police practice departs from the constitutional default rule-in this instance, announcing that the officers are present for the purpose of executing an arrest warrant before resorting to an entry by force—the State bears the burden of proving the constitutional reasonableness of the alternative employed by police. *See State v. Mann,* 103 N.M. 660, 664, 712 P.2d 6, 10 (Ct.App.1985) (observing that the prosecution bears the burden of establishing an exception to the warrant requirement). Unforeseen circumstances do not automatically justify jettisoning the protections afforded by the constitution. The appropriate analysis under the Fourth Amendment and Article II, Section 10 of the New Mexico Constitution involves a comparison of the balance of interests furthered by entry preceded by (or simultaneously accompanied by) an announcement of purpose and authority and the balance of interests served by an unannounced, forced entry at gunpoint. To the extent that safety [6] is the interest relied upon by the State to justify departure from the constitutional default rule, the State bears the burden of proving that the risk of harm presented by the alternative chosen by

---

5. New Mexico law does not criminalize a refusal to admit officers executing a warrant when the defendant does not know that the officers are attempting to serve or execute process. NMSA 1978, § 30–22–1(A) (1981). The crime of evading arrest includes a requirement that the defendant have had knowledge that the officer was attempting to apprehend or arrest the defendant. Subsection 30–22–1(B); UJI 14–2215 NMRA. These *mens rea* requirements underscore the importance of announcing the authority of the warrant early in the process of executing the warrant so as to render resistance or evasion unlawful.

6. The district court relied solely on officer safety and did not make findings addressing how dispensing with an announcement furthered the State's interest in arresting Defendant. On remand, the district court should compare the relative effectiveness of the unannounced entry by force against methods of securing Defendants's person that did not require dispensing with an announcement.

police compares favorably to the risk of harm presented by an entry following (or at least accompanied by) an announcement of purpose and authority. In other words, it is unreasonable to sacrifice privacy interests absent a corresponding gain in safety. This requires more than a finding that the executing officers were "unsafe" in some general sense as found by the district court. Serving a warrant rarely will be completely safe, yet announcement remains the constitutional default rule, not the exception. Moreover, the knock-and-announce rule furthers *occupant* safety as well as officer safety. *Attaway,* 117 N.M. at 151, 870 P.2d at 113. Even if we were to assume that a practice of immediate resort to armed force materially advances the interest of officer safety by comparison to entry after compliance with the knock-and-announce rule—a circumstance that has not yet been proven—any gain in *officer* safety from immediate resort to entry by force with guns drawn still must be balanced against any increased risk that civilian bystanders will be injured in the course of an entry by force.

{31} Contrary to the dissent's assertion, we have not established a bright line rule that an officer's crossing the threshold of a residence to block a doorway prior to an announcement will always violate the Fourth Amendment or Article II, Section 10. By way of example, a case in which the officer blocks the door while simultaneously announcing that he has a warrant would be materially distinguishable from the present case. Moreover, we have not decided that the unannounced forced entry in this case was unreasonable *as a matter of law,* nor do we mean to foreclose the State from proving on remand that the course of conduct followed by the executing officers was constitutionally reasonable. Rather, we merely hold that on the record before us, the State did not meet its burden of proving that the alternative course of conduct followed by the officers in fact furthered the interest in officer and occupant safety. We decline to unquestioningly accept the unproven proposition that immediate resort to armed force actually advances the interests of officer and occu-

pant safety. Without proof that safety interests in fact are advanced by a forced entry at gunpoint, a court can only speculate as to how the balance of interests furthered by an unannounced forced entry at gunpoint compared to the balance of interests furthered by an announced entry.

{32} We conclude that on the particular facts of this case, the State failed to carry its burden of demonstrating that the balance of privacy interests versus law enforcement interests justified dispensing with an announcement of the officer's purpose and authority. Two factors stand out. First, and most importantly, the officers executing the warrant were not given any specific information that Defendant or any other occupant was armed and dangerous. Second, the intrusion in this case was into a private residence, a setting where Fourth Amendment and Article II, Section 10 privacy interests traditionally are of heightened importance.

{33} We conditionally reverse the order denying Defendant's motion to suppress. We remand to the district court for reconsideration of Defendant's motion under the standards set out in this opinion.[7] Since service of an arrest warrant seems to us to be a Fourth Amendment context in which empirical evidence can be useful in "unmasking the theoretical assumptions that undergird constitutional law," Tracey L. Meares & Bernard E. Harcourt, *Forward: Transparent Adjudication and Social Science Research in Constitutional Criminal Procedure,* 90 J.Crim. L. 733, 736 (2000), we encourage the district court to receive empirical evidence bearing upon the reasonableness of the officers' decision to force entry without an announcement that they were acting pursuant to a warrant.

{34} **IT IS SO ORDERED.**

I CONCUR: RODERICK T. KENNEDY, Judge.

WECHSLER, Judge (dissenting).

{35} I respectfully dissent from the majority opinion. I agree with the majority that

---

7. In fairness to the officers, the State, and the district court, we acknowledge that prior cases

had not clearly articulated the requirement of an

announcement is preferable. I also agree with the majority's discussion of the history, importance, and purpose of the knock-and-announce rule, but I conclude that the ultimate test, reasonableness, was met in this case. The majority opinion appears to create a bright-line rule of announcement before officers make any entry beyond a doorway. *But see, e.g., State v. Duran,* 2005–NMSC–034, ¶ 34, 138 N.M. 414, 120 P.3d 836 ("Our case law has consistently disfavored a bright-line test in analyzing Fourth Amendment questions."); *State v. Bricker,* 2006–NMCA–052, ¶ 26, 139 N.M. 513, 134 P.3d 800 ("Our appellate courts have preferred a balancing-of-interests test for reasonableness, rather than a bright-line test."), *cert. granted,* 2006–NMCERT–005, 139 N.M. 568, 136 P.3d 569. Because I believe that the reasonableness test was met under the specific and unusual facts of this case, I dissent.

{36} When our Supreme Court in *Attaway* first held that the knock-and-announce rule has constitutional significance, it stressed that "the ultimate question in all cases regarding alleged search and seizure violations is whether the search and seizure was reasonable." *Attaway,* 117 N.M. at 149, 870 P.2d at 111. *Attaway* held that "partial compliance or non-compliance with the rule of announcement may be excused if exigent circumstances exist." *Id.* at 151, 870 P.2d at 113. These rules remain unchanged. *See Lopez,* 2005–NMSC–018, ¶ 27, 138 N.M. 9, 116 P.3d 80.

{37} "[T]he reasonableness of the manner of execution of a warrant must be evaluated in the light of *each* of the interests served by the announcement rule." *Reynaga,* 2000–NMCA–053, ¶ 13, 129 N.M. 257, 5 P.3d 579. In weighing the purposes served by the knock-and-announce rule, I find *Chandler* to be persuasive. In *Chandler,* police officers executing a search warrant knocked on the defendant's door. *Chandler,* 119 N.M. at 734, 895 P.2d at 256. The defendant answered and police entered without announcing their purpose. *Id.* at 734–35, 895 P.2d at 256–57. We held that it was not ineffective assistance of counsel for the defendant to fail to raise a knock-and-announce challenge because it was "highly unlikely that [the defendant] could have prevailed." *Id.* We noted that "[o]nce the property owner answers the door, opens it, and sees uniformed officers, there is no need to destroy property through forced entry; the home is not defiled through a surprise assault; and the occupants will not resort to violence in the misapprehension that robbers have attacked their dwelling." *Id.* at 735, 895 P.2d at 257.

{38} In this case the policy concerns underlying the adoption of the knock-and-announce rule—officer safety, protection of privacy, and avoidance of property damage—were all better served by the officers' actions than by a strict application of the knock-and-announce rule. *See id.* The majority's proposed procedure—requiring officers to allow Defendant to close the door before announcing their presence and waiting for a response—would have only frustrated the purposes of the knock-and-announce rule.

{39} First, had Defendant successfully closed his door against the orders of the officers, he could have escaped or armed himself. This case is not one in which Defendant might have mistakenly attacked the officers in response to what appeared to be a burglary or another illegal intrusion. *See, e.g., Reynaga,* 2000–NMCA–053, ¶ 13, 129 N.M. 257, 5 P.3d 579 (noting that officer safety is better preserved by avoiding "forcible entry by an officer masquerading as a maintenance man"). The officers were both in uniform and Defendant's response to their presence indicated that Defendant knew they were officers. This case is also not a situation in which it was unclear whether Defendant intended to resist police action. *See, e.g., id.* ¶ 12 ("It is not at all clear to us that it is to an officer's advantage for [the decision to accede or resist authority] to be made after the officer has entered the premises to be searched."). At the time that the majority would have had the officers step back and announce the purpose of their visit, Defendant was actively, and forcefully, disobeying the directions of the officers to not close the door.

{40} Second, the officers would have been more likely to damage property in their entry if they had waited until the door was

announcement of purpose and authority *in addition to* an announcement of presence.

completely closed before forcing it open. *See Reynaga*, 2000–NMCA–053, ¶ 13, 129 N.M. 257, 5 P.3d 579 (noting that "[a] ruse that causes an occupant to open a door ... may very well serve the interest of avoiding the damage to the door that would result from a breaking"); *see also, e.g., Hudson*, —— U.S. at ——, 126 S.Ct. at 2165 (noting that one purpose of the knock-and-announce rule is to allow the door to be opened rather than broken); *United States v. Kemp*, 12 F.3d 1140, 1142 (D.C.Cir.1994) (noting that the interest in "preventing unnecessary destruction of property [is not] implicated when the door is open and the officers can enter peaceably into the premises").

{41} Finally, Defendant and others in the residence are more likely to be surprised, and their privacy invaded, a minute or two after the door closes than they are when the door remains open and they know the interior of their apartment is exposed to view by passersby in the hall. I certainly agree with the majority that "[t]he sanctity of the home is not abandoned simply by leaving a door cracked." *Halpern*, 2001–NMCA–049, ¶ 14, 130 N.M. 694, 30 P.3d 383. But the privacy interests served by the knock-and-announce rule are not identical to the privacy interests served by the rule requiring a search warrant. The interest served by the knock-and-announce rule:

> protects those elements of privacy and dignity that can be destroyed by a sudden entrance. It gives residents the opportunity to prepare for the entry of the police. The brief interlude between announcement and entry with a warrant may be the opportunity that an individual has to pull on clothes or get out of bed. In other words, it assures the opportunity to collect oneself before answering the door.

*Hudson*, —— U.S. at ——, 126 S.Ct. at 2165 (internal quotation marks and citation omitted). In this case, Defendant had collected himself in anticipation of leaving his apartment when the door opened. I would therefore conclude that Defendant's privacy interest, if any, was minimal, and that the majority's proposed procedure—allowing Defendant to close the door and then reopen it after a moment had passed—would not have significantly furthered his interest.

{42} In balancing the totality of the circumstances, then, I would hold that the interests underlying the knock-and-announce rule were met in this case and that the officers' entry was therefore reasonable. *See Lopez*, 2005–NMSC–018, ¶¶ 26–28, 138 N.M. 9, 116 P.3d 80 (holding that determination of reasonableness requires viewing the totality of the circumstances and weighing the interests of the State against the interests of the defendant). The State's interest in safely apprehending Defendant were strong. *Cf. id.* ¶ 26 (finding a "legitimate and strong" interest in "the expeditious and safe execution of a search warrant"). Defendant's interests in property and privacy, on the other hand, were minimal at the time he opened the door. *See Attaway*, 117 N.M. at 151, 870 P.2d at 113 ("An otherwise legal search pursuant to a warrant is not made unreasonable by an unannounced entry when privacy and occupant safety interests are minimal and the interests of law enforcement are strong.").

{43} The facts of this case, particularly when viewed in the light most favorable to the State, evidence reasonable actions on the part of the police officers. The officers went to an apartment to execute a valid warrant. Before they knocked, the door opened and officers saw a man fitting the description of the person they sought. Both officers testified that upon seeing the officers, the man attempted to retreat into the apartment and close the door. The officers told Defendant not to close the door and put a foot into the doorway to prevent Defendant from disobeying them. It would have been unreasonable for the officers to allow Defendant to close the door and escape while the officers waited for him to return to the door, and the law should not require such an impractical result. I agree that it would have been better had the officers informed Defendant that they had a warrant immediately upon seeing him, but I would not fault them for a delay of only a few seconds while they prevented Defendant from barricading himself inside the apartment or escaping through a window.

{44} Furthermore, our courts have recognized a futility exception to the knock-and-announce requirement. *See, e.g., Lopez*, 2005–NMSC–018, ¶ 10, 138 N.M. 9, 116 P.3d

80 (listing circumstances in which the knock-and-announce rule is not mandated, such as when officers have reasonable suspicion that compliance would be futile); *Attaway*, 117 N.M. at 151 n. 7, 870 P.2d at 113 n. 7 (recognizing that circumstances besides officer safety concerns, including when a "suspect knows of officer's presence and purpose before compliance," might justify noncompliance with the knock-and-announce rule); *State v. Ortega*, 114 N.M. 193, 196, 836 P.2d 639, 642 (Ct.App.1992) (noting that noncompliance with the knock-and-announce rule has been held to be justified when occupants know of the presence and purpose of law enforcement), *aff'd*, 117 N.M. 160, 870 P.2d 122 (1994); *State v. Kenard*, 88 N.M. 107, 108–09, 537 P.2d 1003, 1004–05 (Ct.App.1975) (holding that the officer's failure to state his purpose was justified when the defendant fled from the door upon being confronted by police). The United States Supreme Court has also recognized that incomplete compliance with the knock-and-announce rule may be excused when full compliance would have been futile. *See, e.g., Ker v. California*, 374 U.S. 23, 47, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963) (Brennan, J., dissenting in part) ("Even if probable cause exists for the arrest of a person within, the Fourth Amendment is violated by an unannounced police intrusion into a private home, with or without an arrest warrant, except ... where the persons within already know of the officers' authority and purpose ... or ... where those within, made aware of the presence of someone outside (because, for example, there has been a knock at the door), are then engaged in activity which justifies the officers in the belief that an escape or the destruction of evidence is being attempted."), *adopted in relevant part by Sabbath v. United States*, 391 U.S. 585, 591 n. 8, 88 S.Ct. 1755, 20 L.Ed.2d 828 (1968); *Richards v. Wisconsin*, 520 U.S. 385, 394, 117 S.Ct. 1416, 137 L.Ed.2d 615 (1997) ("In order to justify a "no-knock" entry, the police must have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence.").

{45} The circumstances in this case justify the officers' partial compliance. I agree with the majority's refusal "to adopt a presumption that a homeowner who peacefully opposes an apparently warrantless ... entry necessarily will resist the authority of a warrant." However, given the facts of this case, in which Defendant disobeyed the commands of uniformed officers immediately before their entry into his apartment, I believe it would have been futile for the officers to announce their purpose. Defendant's actions were not mere opposition and the officers' response was reasonable. At least two other jurisdictions have concluded that the knock-and-announce rule was not violated by police action in similar situations. *See State v. Berry*, 174 Wis.2d 28, 496 N.W.2d 746 (Ct. App.1993); *Commonwealth v. Davis*, 331 Pa.Super. 285, 480 A.2d 1035 (1984); *see also* 2 LaFave, *supra*, § 4.8(c), at 671 n. 59 ("But if the announcement to the person who answers the door that the caller is a policeman results in immediate resistance, entry may be accomplished prior to announcement of purpose...."); 2 Joseph G. Cook, *Constitutional Rights of the Accused* § 4:40 (3d ed. 1996) ("A refusal to open the door once the presence of officers is known will justify a forcible entry.").

{46} Officers in *Berry* were approaching a house to execute a search warrant when they saw an occupant looking at them from a window. *Berry*, 496 N.W.2d at 747. The uniformed officers yelled "police," but the occupant moved to close the front door. *Id.* When the officers reached the house, they opened the front door, which had not been completely closed, without any additional announcement. *Id.* The court found no knock-and-announce violation:

Likewise, we determine that rigid compliance with the rule of announcement in this case would have been a useless gesture. [The defendant] had been looking out the window as the officers approached the house and yelled "Police." The officers were dressed in a manner that clearly identified them as law enforcement. After seeing the officers, [the defendant] began to close the door in an obvious attempt to prohibit the officers from gaining entry. From this action, the officer reasonably

believed that to announce that he had a search warrant to wait for admission would have been futile. *Id.* at 748. The court noted that "[i]t stretches belief to suppose that [the suspect] would have immediately stopped pushing on the door if [the officer] had added, after identifying himself as a police officer, that he possessed a search warrant." *Id.* at 749 (alterations in original) (internal quotation marks and citation omitted).

{47} In *Davis,* officers executing a search warrant were approaching a house when a man saw them and fled inside. *Davis,* 480 A.2d at 1041. The police knocked and announced their presence, but did not inform the occupants of the house that they had a warrant and did not wait more than ten seconds before forcing entry. *Id.* The defendant argued that officers violated the knock-and-announce rule both by failing to state that they had a warrant and by failing to wait a reasonable amount of time before forcing entry. *Id.* The court disagreed. Instead, the court noted that "[i]t has long been the rule ... that where the police are reasonably certain that the occupants are aware of their presence and purpose, the police need not knock and announce," and held that "[w]here an occupant sees the police and immediately retreats back into the premises, as is the case here, the duty of the police to knock, announce, and wait is obviated." *Id.* at 1042.

{48} Because I conclude that further compliance with the knock-and-announce rule would have protected no legitimate interest of Defendant and could have served no purpose but allowing Defendant to arm himself or escape, I believe the Fourth Amendment and Article II, Section 10 were not violated by the officers' entry in this case. I do not believe that it is reasonable to require officers to follow futile procedures. I therefore agree with the district court that, under the limited facts of this case, the officers' conduct was justified.

{49} I also disagree with the majority's characterization of Defendant's actions in resisting the officers as "an assertion of constitutional rights." Certainly shutting a door can successfully terminate a consensual encounter with police. *Cf. State v. Scott,* 2006–NMCA–003, ¶ 25, 138 N.M. 751, 126 P.3d 567

(noting that a police encounter is a non-consensual seizure "if a reasonable person would not have felt free to decline [the officers'] requests to open the door or to otherwise ignore the [officers'] presence") (alterations in original) (internal quotation marks and citation omitted), *cert. granted,* 2006–NMCERT–001, 139 N.M. 273, 131 P.3d 660. But here the encounter was non-consensual from the moment the officers told Defendant not to close the door. As I conclude above, I believe the officers were engaged in lawful execution of a warrant and did not violate the Fourth Amendment or Article II, Section 10. But even if the officers were engaged in unlawful police conduct, I believe that Defendant did not have the right to disregard their commands. Nor did Defendant have the right to close his door on Officer Elrick's foot, even if it was in the doorway in violation of Defendant's rights. In New Mexico the remedy for an unlawful arrest or search is civil. *See State v. Chamberlain,* 112 N.M. 723, 729, 819 P.2d 673, 679 (1991) ("If the [police conduct] had been illegal, there are remedies within the law to protect appellant's rights. Those remedies do not include resort to self-help measures."). The victim of a peaceable, but illegal, arrest has no right to commit assault or to otherwise resist the commands of the arresting officers.

{50} For the above-stated reasons, I respectfully dissent.