This memorandum opinion was not selected for publication in the New Mexico Appellate Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished memorandum opinions. Please also note that this electronic memorandum opinion may contain computer-generated errors or other deviations from the official paper version filed by the Court of Appeals and does not include the filing date.

# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.                                    **NO.  31,420**

**KEVIN BROWN**,

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF UNION COUNTY**
**John M. Paternoster, District Judge**

Gary K. King, Attorney General
Santa Fe, NM
M. Anne Kelly, Assistant Attorney General
Albuquerque, NM

for Appellee

Alex Chisholm
Albuquerque, NM

for Appellant

## MEMORANDUM OPINION

**HANISEE, Judge.**

{1}     Defendant was found guilty by a jury of trafficking heroin and conspiracy to traffic heroin—charges that arose from an incident in which Defendant was alleged to have passed an envelope containing heroin to another inmate while Defendant was in the penitentiary.  On appeal, Defendant challenges the sufficiency of the evidence to support the trafficking charge, arguing that the evidence did not support the jury's finding that Defendant knew the envelope contained heroin beyond a reasonable doubt.  We hold that sufficient evidence supports Defendant's conviction and affirm.

**DISCUSSION**

**A.     Standard of Review**

{2}     The parties dispute the applicable standard of review.  Defendant contends that because he preserved an objection to the jury instruction for trafficking heroin, we should review for reversible error, and he also asserts that we should apply the sufficiency of the evidence standard.  We agree with the State that Defendant does not raise an argument on appeal about the adequacy of the jury instruction, but rather challenges the sufficiency of the evidence.  Defendant further argues that when we review for substantial evidence, there is a limitation on the extent to which we may rely on inferences drawn from circumstantial evidence to prove an essential element of the crime.  Defendant relies on *State v. Quintana* in support of his contention that

where circumstantial evidence is used to prove an element, "such evidence must point unerringly to the defendant's guilt, and must be incapable of explanation by any reasonable hypothesis of the defendant's innocence." 87 N.M. 414, 422, 534 P.2d 1126, 1134 (Ct. App. 1975) (Sutin, J., dissenting) (citing *State v. Malouff*, 81 N.M. 619, 620, 471 P.2d 189, 190 (Ct. App. 1970). As the Supreme Court later explained, however, " 'incompatible with any rational theory of . . . innocence' means 'the evidence supporting the verdict [must] provide a sufficient basis upon which to infer guilt beyond a reasonable doubt.' " *State v. Apodaca*, 118 N.M. 762, 766, 887 P.2d 756, 760 (1994) (quoting *State v. Vigil*, 110 N.M. 254, 256, 794 P.2d 728, 730 (1990) (alterations in original)). What Defendant purports to be a limitation on our review of the sufficiency of circumstantial evidence is not so; it "is really nothing more than an application of the substantial evidence rule." *Vigil*, 110 N.M. at 256, 794 P.2d at 730 (internal quotation marks and citation omitted); *see State v. Chandler*, 119 N.M. 727, 732, 895 P.2d 249, 254 (Ct. App. 1995) (rejecting the separateness of a circumstantial evidence rule and explaining that having evaluated the circumstantial evidence, "the jury, by its verdict, has necessarily found the hypothesis of guilt more reasonable than any of the theories of innocence advanced by the defendant. Thus, we evaluate whether substantial evidence supports the verdict of guilt beyond a reasonable doubt." (citation omitted)), *holding modified on other grounds by State v.*

3

*Vargas*, 2007-NMCA-006, ¶ 14, 140 N.M. 864, 149 P.3d 961. Accordingly, we apply our usual standard of review for the sufficiency of the evidence.

{3} "The test for sufficiency of the evidence is whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilty beyond a reasonable doubt with respect to every element essential to a conviction." *State v. Riley*, 2010-NMSC-005, ¶ 12, 147 N.M. 557, 226 P.3d 656 (internal quotation marks and citation omitted). The reviewing court "view[s] the evidence in the light most favorable to the guilty verdict, indulging all reasonable inferences, and resolving all conflicts in the evidence in favor of the verdict." *State v. Cunningham*, 2000-NMSC-009, ¶ 26, 128 N.M. 711, 998 P.2d 176. "The question before us as a reviewing [c]ourt is not whether we would have had a reasonable doubt [about guilt] but whether it would have been impermissibly unreasonable for a jury to have concluded otherwise." *See State v. Rudolfo*, 2008-NMSC-036, ¶ 29, 144 N.M. 305, 187 P.3d 170. Conversely stated, we ask whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Cunningham*, 2000-NMSC-009, ¶ 26 (emphasis, internal quotation marks, and citation omitted).

**B.    Analysis**

{4}    In order to prove that Defendant trafficked heroin, the State had to establish the following beyond a reasonable doubt:

1. [D]efendant transferred [h]eroin to another;

2. [D]efendant knew it was [h]eroin or believed it to be [h]eroin or believed it to be some drug or other substance the possession of which is regulated or prohibited by law;

3. This happened in New Mexico on or about the 15th day of December[] 2008.

{5}     The evidence the State presented to establish Defendant's knowledge under the second element was circumstantial, as is often the case "[b]ecause an individual's intent is seldom subject to proof by direct evidence[.]" *State v. Nozie*, 2009-NMSC-018, ¶ 32, 146 N.M. 142, 207 P.3d 1119 (alteration in original) (internal quotation marks and citation omitted). In this regard, the State presented the testimony of Sergeant Thomas from the penitentiary, who was in charge of monitoring the housing and movement of inmates on December 15, 2008, at the time of the incident.

{6}     Sergeant Thomas explained the layout of the housing unit in which the incident occurred, stating that there were five large contiguous cells called pods, lettered A through E, that housed between fifty-six to sixty inmates a piece. Each pod was two-storied and separated from the next pod by large walls that have an emergency door. The pods were arranged in an arc circling the control picket, which sat at the center

of the housing unit and was occupied by officers who watched the inmates and contained a computer that controlled the housing unit. The control picket was an enclosed room that had walls made of concrete from the floor to waist-high and the rest was made of glass on all sides. The control picket also had a continuous feed running from the surveillance cameras placed in each pod. Sergeant Thomas further explained that inmates are not permitted to be around the emergency doors between pods, that they will be written up for being in the unauthorized area, and that there is a red box painted on the floor to indicate the prohibited area.

{7}     Sergeant Thomas testified that he happened to be in the control picket at around 8:10 a.m. on December 15, 2008, when he saw on the camera feed that Defendant was in the D pod standing at the emergency door in the prohibited area on the bottom tier separating the D and C pods. Sergeant Thomas had the attending officer display the camera feed from the C pod, and was then able to view another individual standing at the other side of the emergency door. Sergeant Thomas testified that it appeared the inmates were conversing through the steel emergency door because their faces were at the crack of the steel door talking into it, and they were turning their heads as if to listen to one another. Sergeant Thomas then watched Defendant bend over at the door and make a hand motion that looked as though he was sliding something under the door. Sergeant Thomas stated that the other inmate, who he later identified as

6

Larry Woolridge, bent down to pick up what Defendant slid through. Upon viewing this, Sergeant Thomas immediately went into the C pod, which required him to turn his back on his view of the pod for a few seconds. The package was handed off to another inmate, and when Sergeant Thomas entered the C pod it was in the hands of Wes Allen, who handed it to Damien Hambleton when the sergeant hollered at Allen. Sergeant Thomas then hollered at Hambleton, who walked around a table, dropped the package on a chair, and walked toward the sergeant. Another inmate was sitting on the chair and leaned back to conceal the package. Sergeant Thomas retrieved the package, which he described as paper folded into a kind of make-shift envelope containing eight small pieces of heroin ("BBs") wrapped in cellophane with the word "giant" written on the outside of the paper package. Sergeant Thomas also explained that this relay between Defendant and the other inmates took place during a predictably busy time period in the penitentiary's housing unit, when inmates were coming to the doors and leaving their pods to attend scheduled meetings, jobs, and activities.

{8}     The State introduced three photographs and two short video clips that were played for the jury and explained by Lieutenant Carrell, who was the lead supervising officer of the housing unit at the time of the incident. One video was recorded in the D pod where Defendant is shown standing at the emergency door, talking and

7

listening through it, bending down, walking away, and then returning to the door. The other video was recorded in the C pod where Woolridge is seen standing at the emergency door for several seconds and then bending down, and thereafter is joined by Allen, and they both walk away from the door. The three photographs contained in State's Exhibit 2 are stills from the videotape feed showing (1) Defendant walking in the middle of the D pod, (2) Defendant at the emergency door separating the D and C pods, and (3) Woolridge and Allen on the other side of the emergency door separating the C and D pods. This evidence was consistent with Sergeant Thomas's testimony of what he observed.

{9}     The State also presented the testimony of Dwayne Austin, the chief of security at the penitentiary. He testified that when he questioned Defendant about the incident, Defendant told Austin that an inmate from the E pod, who Defendant did not know, gave him two small pieces of paper under the emergency door and Defendant walked over to the C pod and slid them under that emergency door. Austin testified that it was unlikely that Defendant would just happen to hear someone at the emergency door to the E pod because you can only hear through the emergency doors if your ear is to the crack of the door and because it was a predictably busy time with high traffic and movement among the inmates. Rather, Austin believed that Defendant had been communicated with through hand signals from another pod or that he previously

interacted with other inmates during some scheduled activity. Austin also explained that inmates would want to know who they are dealing with and coordinate efforts when transacting in drugs, given the harsh potential punishments involved and the possibility that another inmate might steal the drugs.

{10} The defense presented the testimony of Mr. Hambleton and Defendant, who offered an alternative explanation for the inmates' actions. Hambleton testified that he did not know Defendant before Defendant was charged with crimes related to the drugs, that Defendant had nothing to do with the drugs, that the drugs belonged to Hambleton, and that the package was in his possession in his pocket since the day before Defendant was charged with possession and conspiracy. Defendant testified that he does not take drugs and does not deal drugs in prison. Defendant stated that he grew up with Woolridge and explained that he was talking to Woolridge through the emergency door about buying a pizza for him and his girlfriend and slid a note under the door asking Woolridge to call Defendant's girlfriend and to order them pizza with Defendant's money, because Woolridge had privileges that would permit ordering pizza and Defendant did not.

{11} On appeal, Defendant contends that because he offered a reasonable hypothesis to explain his actions and because there was no evidence to suggest that Defendant knew about the drugs, the State's circumstantial evidence did not rise to the level of

substantial evidence as a matter of law. We disagree with Defendant's characterization of the State's evidence and his characterization of the jury's role. There was plenty of evidence from which the jury could infer that Defendant had knowledge of the drugs, including the furtiveness of his movements, the coordination of the inmates' actions, the time of day that was chosen to pass the drugs, the desirability of coordinating efforts with known people to avoid getting caught with drugs or losing the drugs, and the inconsistency in Defendant's explanations for what had occurred. It is incorrect to state that the jury must accept any reasonable explanation offered through direct evidence by the defense where the State's case is circumstantial. Rather, the jury as fact finder is required to weigh the evidence and determine the credibility of the witnesses; therefore, it is free to reject Defendant's version of events, even assuming it is a reasonable, alternative explanation. *State v. Rojo*, 1999-NMSC-001, ¶ 19, 126 N.M. 438, 971 P.2d 829; *State v. Salas*, 1999-NMCA-099, ¶ 13, 127 N.M. 686, 986 P.2d 482. We also observe that "[a]n appellate court does not evaluate the evidence to determine whether some hypothesis could be designed which is consistent with a finding of innocence." *State v. Reyes*, 2002-NMSC-024, ¶ 43, 132 N.M. 576, 52 P.3d 948 (internal quotation marks and citation omitted), *abrogated on other grounds by Allen v. LeMaster*, 2012-NMSC-001, ¶ 36, 267 P.3d 806. Again, "[t]he only test recognized by this court to review the

sufficiency of the evidence from a jury trial is one inquiring whether substantial evidence, either direct or circumstantial in nature, exists to support a verdict of guilty beyond a reasonable doubt with respect to each essential element of a crime charged." *State v. Duran*, 107 N.M. 603, 605, 762 P.2d 890, 892 (1988), superseded by statute on other grounds as stated in *State v. Triggs*, 2012-NMCA-068, 281 P.3d 1256.

**CONCLUSION**

{12}      Viewed in the light most favorable to the State, we hold that the evidence was sufficient such that a rational jury could have found the essential elements of trafficking heroin. *See Cunningham*, 2000-NMSC-009, ¶ 26. Specifically, the record shows that the State presented enough circumstantial evidence to support an inference of knowledge. As a result, we affirm Defendant's conviction.

{13}      **IT IS SO ORDERED.**

_____
**J. MILES HANISEE, Judge**

**WE CONCUR:**

_____
**LINDA M. VANZI, Judge**

11

_____

**M. MONICA ZAMORA, Judge**